[No. 17708-7-I. Division One. June 22, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. KEITH MARVIN DICKENSON, *Appellant*.

458

*Raymond H. Thoenig* and *Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Stuart Heath, Deputy,* for respondent.

WEBSTER, J.—Appellant Keith Marvin Dickenson appeals his judgment and sentence entered after a jury found him guilty of murder in the second degree (RCW 9A.32.050). Dickenson contends that the court erred by disallowing impeachment evidence of a State's key witness during cross examination. Finding that the impeachment evidence was improperly suppressed but that there was overwhelming evidence to convict Dickenson without the key witness's testimony, we affirm.

FACTS

On August 25, 1985, police found the body of Ed Howard lying next to the couch in the living room of his apartment. His small detached apartment was located on an alley in a residential area of Auburn. The investigating officer entered the apartment through the front door, which was slightly ajar. The apartment was in disarray: blood was spattered on the walls, cushions were off the couch, an end table and a chair had been overturned, and a portion of the stovepipe had been removed. In the living room the police found a dented propane cylinder and a four–by–four approximately 4 feet long. They also found a bullet lodged in the roof of

the apartment. Judging from its trajectory, they determined that it had come from the living room.

A pathologist determined that Howard died on August 25, 1985, between 4 a.m. and 8:30 a.m., of injuries to the skull and brain caused by blunt force. Forensic evidence suggested that the propane tank and the four–by–four may have been used to inflict the injuries. Criminologists testified that blood and hair on the propane tank and the four–by–four may have come from Howard. Howard had also been strangled, but strangulation did not cause his death. His body contained a potentially lethal level of cocaine. Keith Dickenson was arrested in connection with Howard's death, and on August 29, 1985, he was charged with second degree murder.

At trial Errol Arnett, a friend of Howard's, testified that in response to a phone call on August 25, 1985, he went to Howard's apartment and found him dead. However, he had an ex–girl friend call the police. Arnett telephoned Dickenson on August 25 after the killing had occurred, and Dickenson told him that two men had come to Dickenson's house on August 24 and warned him to stay away from Howard if he did not want to get hurt. Dickenson said he went over to Howard's house to warn him about these two men, but the two men were already there. They told him to get out or he could stand to be hurt. Dickenson evaded Arnett's request for a description of the men.

Arnett said that both Howard and Dickenson were dealers in cocaine but that their relationship was not amicable. The two men were both "bullheaded" and played "mind games" with each other. Dickenson owed Howard $10,000 for past deliveries of cocaine and Howard was serious about collecting this debt. Two days before the killing Arnett overheard Howard and Dickenson having an argument in which it sounded like Dickenson had the upper hand. Howard mainly used words to intimidate others, and he also carried a gun.

Connie Wilson, Dickenson's former girl friend, testified that both Howard and Dickenson were heavy cocaine users.

She also used cocaine heavily, spending $1,000 to $1,500 for several days' supply. She frequently went to Dickenson's house to get high on cocaine but did not use cocaine every day. On the day before the killing she went out on a date and drank two shots of tequila. She then went to Dickenson's house where Dickenson gave her a shot of cocaine in the arm.

Connie said that Howard was also at Dickenson's house. After Howard left Connie left also, intending to meet Howard at his apartment. She lied to Dickenson about where she was going because she was afraid he would get mad and not let her go. However, when she could not locate Howard's house, she called Dickenson for directions. He hung up on her. After she called him three times he finally gave her the directions, and she arrived at Howard's house about 4:30 a.m. on August 25, 1985. Howard told her to call Dickenson back. She then called Dickenson and told him she was going home because Howard had no cocaine to give her. She testified that Howard had a gun and a vial of cocaine and that he was using a propane bottle to "freebase" on cocaine.

Connie said that, while she was still at Howard's house, Dickenson arrived. It was around 6:30 a.m. After he knocked on the doors and windows and repeatedly asked to be let in, Howard let him in. She said that Dickenson did not appear to be high on drugs or impaired in his ability to function. Dickenson asked for some cocaine, and Howard replied that Dickenson had no way to pay for it because everything Dickenson owned was Howard's. Howard then remarked to Connie, "You don't need this and this scum." Connie was not sure whether Dickenson heard this remark. She then left the house. She said that, when she left, the house was in order: the propane cylinder was not bent; the chairs were sitting upright; the cushions were on the couch; there were no stains on the wall; and the stovepipe was in place.

Connie stated that, as she left the house, she saw Dickenson pointing what appeared to be a gun at Howard. She

testified that the following exchange took place:

Q [Prosecutor:] What did Keith [Dickenson] say?
A He said, "You son–of–a–bitch, sit down and shut up." That's when I looked through the door. It was open. I don't think he knew I could see him.
 He said, "Don't you know the gun is loaded? Ed [Howard], don't shoot," as if Ed had the gun. But I seen his arms out.
Q When you say his, you mean Keith Dickenson's?
A Keith Dickenson's.
Q Was Keith Dickenson giving the command to Ed to sit down?
A Yes.
Q Did you hear Ed Howard say anything?
A No.
Q What happened next?
Q After that I just stood there. I was watching them. And the gun went off, and Keith's hands went up. I didn't know if he hit him or—

Connie said that, when the gun went off, she was talking to Paula Moore, a friend of Dickenson's who was waiting outside in the alley in a car. When she heard the shot, Connie ran down the alley and onto Main Street. Paula came to get her, but she refused to go back. She then stood in the alley, watching the apartment. From where she was standing she could not see the door to the apartment, but she had a clear view of the rest of the apartment and the alley. She saw no cars or people in the alley and no one enter or leave the house. Connie could hear a lot of thumping and scuffling and Dickenson's voice coming from the apartment. He sounded angry. Keeping her eyes on the house the entire time, she then went to a phone booth and called Steve Ward to pick her up.

Connie testified that after Ward picked her up they drove to her car. When she discovered that her keys were missing, they walked back to the apartment. They were gone approximately 3 minutes, but Connie stated that she could see the apartment the entire time and that she saw no one come in or out. When Connie reached the apartment, Paula remarked that she was scared and Connie told

her to leave. Connie walked to the telephone booth and found her keys. While standing by the telephone booth, she saw Paula and Dickenson drive away from the apartment. Dickenson was sitting on the passenger's side in a slightly hunched over position.

Ward testified that he received a telephone call from Connie about 6:30 a.m. on the day of the killing. After this conversation he picked Connie up at a telephone booth and took her to her car. It took about 5 minutes to drive to her car and to wait while she looked for her keys. From this location he could barely see Howard's apartment. After Connie discovered that her keys were missing they walked down the alley to Howard's apartment. He saw no cars or other people in the alley. As Ward stood in front of the apartment, he saw a body through the door, but could not make out whose body it was. The door was then slammed shut. He heard no sounds or voices from inside the apartment. He then told Connie, "Let's get out of here." They walked to the telephone booth, found her keys, and then observed Paula and Dickenson drive away from Howard's apartment. He saw no one enter or leave the apartment during the time he was with Connie and no other cars besides Paula's car and a white truck in the alley.

Paula testified that on the night of August 24, 1985, she had gone to Dickenson's house to "freebase" on cocaine. She was both high on cocaine and intoxicated; she thought that her ability to recall events was affected by the drugs and alcohol. Dickenson appeared to be high on cocaine also. Paula had talked to Connie around 5:30 a.m. when she called for directions to Howard's apartment. Connie was hysterical and irrational because Dickenson wouldn't give her the directions. Shortly thereafter, Paula rode with Dickenson to Howard's apartment. On their way they drove past Connie's house, but she was not there. They arrived at Howard's apartment about 6 a.m. and parked in the front. Dickenson asked Paula to wait in the car. After knocking on the doors and windows Dickenson eventually went into the apartment. Connie then came out and was talking to

Paula when Paula heard a gun go off. Connie ran down the alley, and Paula tried unsuccessfully to persuade her to come back. Paula was out of sight of the front door for 5 to 10 minutes, but during this time she saw no other people or cars in the alley other than her car and Howard's white pickup. She then returned to her car.

Paula went to the door twice while she waited for Dickenson, and each time he answered the door and assured her that everything was fine. The first time she heard Howard say, "Keith, what's going on?", and Dickenson told her to go wait in the car. She then waited in the car with her windows up for a few minutes before going to the door again. The second time Dickenson asked her to move her car to the back of the apartment. She did not hear Howard's voice this time.

While Paula waited in the back, she saw no people enter or leave Howard's apartment and no cars in the alley. However, she could no longer see the front door of the apartment. During this time Connie came down the alley past the front of the apartment with a man and said to Paula, "You have got to get out of here." Paula waited in back for about 15 minutes. She then drove to the front door and revved her engine a couple of times. Dickenson then hurriedly came out with a baseball jacket draped over his hand. He had a streak of blood on his face and claimed it was from a scuffle with Howard.

Paula dropped Dickenson off at his house, but returned 15 minutes later to ask him what had happened. He had taken a shower and changed clothes and was "freebasing" cocaine. The washer was running. Dickenson told Paula that two men had entered Howard's apartment just before they had left. She stayed with him until the police came on August 27, 1985.

Dickenson denied killing Howard. Dickenson said that he went to Howard's apartment to warn Connie and Howard of danger. He testified that on the evening of August 24, 1985, prior to his visit with Howard, he received a telephone call from California in which he was told that "we

had better get our shit straightened out or there was going to be trouble and somebody was going to get killed." He also testified to receiving a phone call on August 25, 1985, after he had been at Howard's apartment in which he was told to stay away from Howard because Howard was going to be "offed" (killed).

Dickenson said that when he entered Howard's apartment Howard was high on cocaine. Howard asked for his gun and Dickenson handed it to him. At the same time Dickenson pushed the gun away, and the gun then went off. After a brief scuffle, Dickenson laid the gun on the coffee table. He and Howard then "freebased" on cocaine to "calm everybody down." Paula came to the door and Dickenson told her to pull the car around to the back.

Dickenson testified that after he told Paula to pull the car around to the back someone came to the door. Thinking it was Paula, Dickenson opened the door, and two men walked in. When Howard reached for his gun, the men hit Howard in the head. Blood spattered onto Dickenson. Dickenson said, "I am just a customer. I am nobody." The men then told Dickenson to get out of the apartment, and they hit Howard again as Dickenson left.

On cross examination Connie said that Howard was her only friend who had died recently. She also denied recently telling police officers that the police had killed her friend. Defense counsel then moved to impeach Connie with a police report prepared after the killing in connection with her arrest for being drunk and disorderly. In this report the police stated that "Wilson kept saying the police killed her friend." Defense counsel moved to bring in both the officer who took the statement and the man who was with Connie when the statement was made. The court ruled against admission of the statement because (1) the statement was taken in connection with Connie's arrest for being drunk and disorderly and would, therefore, bring in a collateral matter; (2) the statement would distract the jury from the issues; (3) the report would be highly prejudicial compared to the benefit derived; and (4) the statement was not

inconsistent because Connie had not testified that Dickenson committed the crime.

Defense counsel then stated that, if the statement were allowed into evidence, he would phrase his questions to avoid bringing out the fact that Connie had been arrested for drunk and disorderly conduct. The court again denied the motion stating that admission of the statement would open up the whole issue of whether or not Connie was intoxicated and knew what she was saying. The State would then have to bring in witnesses to say what her state of mind was at the time.

The jury found Dickenson guilty of second degree murder, and he appeals. He contends that the court erred by denying his motion to admit the statements contained in the police report, and that, consequently, he did not receive a fair trial. He asks this court to reverse his conviction and to remand for a new trial.

### STANDARD OF REVIEW FOR THE SCOPE OF CROSS EXAMINATION

The scope of cross examination is governed by ER 611, which states in pertinent part:

#### MODE AND ORDER OF INTERROGATION AND PRESENTATION

(a) **Control by Court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

(b) **Scope of Cross Examination.** Cross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Cross examination is an integral part of both civil and criminal proceedings. *Baxter v. Jones,* 34 Wn. App. 1, 3, 658 P.2d 1274 (1983). When a general subject is brought up

on direct examination the cross examiner may question and develop the various phases of that subject. *State v. Ferguson,* 100 Wn.2d 131, 138, 667 P.2d 68 (1983). The trial court may exercise its discretion in determining the scope of questioning in cross examination. ER 611(b); *State v. Coe,* 101 Wn.2d 772, 780, 684 P.2d 668 (1984). A criminal defendant should be given wide latitude on cross examination to show motive or credibility, particularly when the witness is essential to the State's case. *State v. York,* 28 Wn. App. 33, 36, 621 P.2d 784 (1980).

On review the appellate court should not disturb the trial court's rulings on the scope of cross examination absent a manifest abuse of discretion. *State v. Campbell,* 103 Wn.2d 1, 20, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985); *State v. Krausse,* 10 Wn. App. 574, 577, 519 P.2d 266 (1974). Abuse of discretion is "discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

We determine here that the trial court abused its discretion by refusing to admit evidence of Connie's statements to the police.

PRIOR INCONSISTENT STATEMENTS

Dickenson first argues that Connie's statement that the police killed her friend was a "prior inconsistent statement" and, thus, admissible for impeachment purposes.

A witness may be impeached with a prior out-of-court statement of a material fact that is inconsistent with his testimony in court. ER 607; ER 613; *State v. Carver,* 37 Wn. App. 122, 125, 678 P.2d 842 (1984), *review denied,* 101 Wn.2d 1019 (1984); *State v. Jefferson,* 6 Wn. App. 678, 682–83, 495 P.2d 696 (1972). Impeachment evidence affects the witness's credibility but is not probative of the substantive facts encompassed by the evidence. *State v. Johnson,* 40 Wn. App. 371, 377, 699 P.2d 221 (1985).

Washington uses the following test for determining whether statements are inconsistent:

"Inconsistency is to be determined, not by individual words or phrases alone, but by the *whole impression or effect* of what has been said or done. On a comparison of the two utterances are they in effect inconsistent? Do the two expressions appear to have been produced by inconsistent beliefs?"

5 K. Tegland, Wash. Prac. § 256 (2d ed. 1982) (quoting *Sterling v. Radford,* 126 Wash. 372, 218 P. 205 (1923)).[1] *See also United States v. Morgan,* 555 F.2d 238, 242 (9th Cir. 1977) (prior statement should be admitted whenever a reasonable person could infer from comparing the whole effect of the two statements that they were the result of inconsistent beliefs; the important consideration is whether the prior statements of the witness help the trier of fact evaluate the credibility of the witness).

In the case at bar the court erred by finding no inconsistency between Connie's testimony at trial and her statement in the police report. The "whole impression or effect" of Connie's testimony at trial was that Dickenson killed Howard. This impression was created by her testimony (1) that she saw no one but Dickenson enter or leave Howard's apartment on the morning of the murder; (2) that she heard Dickenson swearing at Howard; (3) that she saw Dickenson pointing what appeared to be a gun at Howard; (4) that she heard a shot and scuffling sounds while Dickenson was in the apartment; and (5) that she observed Dickenson emerge from the apartment and sit in the car in a hunched over position. Her subsequent statement to police that "the police killed her friend" directly contra-

---

[1]This approach is in accord with that of other jurisdictions. *See, e.g., United States v. Dennis,* 625 F.2d 782, 795 (8th Cir. 1980) ("inconsistency is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position"); *People v. Stavris,* 75 A.D.2d 507, 426 N.Y.S.2d 741, 743 (1980) (there need not be "a direct and positive contradiction" in order for the prior statement to be admissible; "[i]t is enough that the testimony and the [prior] statements are inconsistent and tend to prove differing facts"). *Commonwealth v. Pickles,* 364 Mass. 395, 402, 305 N.E.2d 107, 111 (1973) ("a 'prior inconsistent statement' need not directly contradict the testimony of the witness. It is enough if its implications tend in a different direction") (cited in 3A J. Wigmore, *Evidence* § 1040 (Supp. 1970)).

dicted her testimony. This inconsistency is important, not because it implicates the police, but because it raises a question about Connie's credibility and perceptions.

## COLLATERAL ISSUE

The State argues that the court properly excluded the report because it concerned the collateral matter of Connie's intoxication.

"A witness or a defendant cannot be impeached upon matters collateral to the principal issues being tried." *State v. Descoteaux*, 94 Wn.2d 31, 37, 614 P.2d 179 (1980), *overruled on other grounds in State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982); *State v. Carr*, 13 Wn. App. 704, 708, 537 P.2d 844 (1975). This court adopts the following test for determining whether or not a fact is a collateral matter: Could the fact upon which error is based have been brought into evidence for a purpose independent of the contradiction? *State v. Hall*, 10 Wn. App. 678, 680, 519 P.2d 1305, *review denied*, 84 Wn.2d 1003 (1974). *Accord, State v. Descoteaux, supra* at 37–38 (matter is collateral if the evidence is inadmissible for any purpose independent of the contradiction).

The State improperly focuses on whether or not Connie's drunkenness was collateral. The proper inquiry is whether the statements in the report are collateral. Those statements, not Connie's drunkenness, are the basis for her impeachment. Because the identity of Howard's killer was the sole issue in this case, Connie's statement identifying the police as her friend's killer was relevant and could have been brought into evidence on direct examination. ER 402; *see also State v. Descoteaux, supra* (evidence of a scheduled polygraph examination found to relate to an element of escape in the first degree, namely, the intent to evade the due course of justice; hence, questions pertaining to the defendant's failure to return to a work release facility because of the pending test found not collateral); *State v. Hall, supra* (evidence that alleged getaway man was present as a patient in a hospital on the night in question

found not collateral because this evidence contradicted defendant's testimony concerning the existence of a getaway man and weakened his credibility concerning identity of his codefendant).[2]

### PROBATIVE VALUE

The State asserts that Connie's statements were more prejudicial than probative concerning the issue of who killed Howard. We disagree.

In determining whether the probative value of proffered evidence is outweighed by its prejudicial effect, the proper focus is on the truth–finding process. *State v. Hudlow,* 99 Wn.2d 1, 13, 659 P.2d 514 (1983); *see* ER 403. Under the Sixth Amendment the truth–finding process requires that the defendant be able to fully confront his accuser. Hence, Dickenson should have been able to call into question the believability of the State's key witness. We find that Dickenson has been denied that right.

### GROUNDS FOR EXCLUSION

In conclusion, the court here based its decision to exclude Connie's statement on "untenable grounds." The grounds for exclusion and the reason each is untenable follow: (1) The court found the report would bring in the collateral matter of Wilson's being drunk and disorderly. This is untenable because in his offer of proof defense counsel stated that he would confine his questions to the statement in the report. The State's concern that the report would impugn the witness's character is baseless in light of the recurring references at trial to cocaine and alcohol abuse by both Connie and the other witnesses. (2) The court said the report would distract the jury from the issues. This is

---

[2]Although found not collateral, the evidence in both *Descoteaux* and *Hall* was held inadmissible. In *Descoteaux* the court determined that the prejudicial effect of the testimony concerning the lie detector test outweighed its probative value under ER 403. *Descoteaux,* at 39. In *Hall* the victim had positively identified the defendant and, therefore, the court did not abuse its discretion in excluding the evidence thereby avoiding a mini trial on the soundness of the alleged getaway man's alibi. *Hall,* at 682.

untenable because the central issue in this case is the identity of Howard's killer. Therefore, a showing that the State's key witness cannot unequivocally identify the killer *focuses the jury on,* rather than distracts the jury from, the issues. (3) The court stated that the report was highly prejudicial compared to the benefit derived. This position is untenable because the prejudice to the State here is not unfair.

Having determined that evidence of Connie's statements to the police should have been admitted, we next consider whether this error requires reversal under the applicable constitutional test.

### Constitutional Test

 A violation of the defendant's rights under the confrontation clause is constitutional error. *Harrington v. California,* 395 U.S. 250, 251–52, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969). A constitutional error is harmless if the appellate court is convinced that it is harmless beyond a reasonable doubt. *State v. Stephens,* 93 Wn.2d 186, 190–91, 607 P.2d 304 (1980). However, constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless. *State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986). In Washington the "overwhelming untainted evidence" test is used to determine whether constitutional error is harmless. Under this test the appellate court looks only at the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Guloy,* at 426. *See, e.g., Parker v. Randolph,* 442 U.S. 62, 70–71, 60 L. Ed. 2d 713, 99 S. Ct. 2132 (1979); *Brown v. United States,* 411 U.S. 223, 231, 36 L. Ed. 2d 208, 93 S. Ct. 1565 (1973).

Applying this test, we find that the State has carried its burden. Notwithstanding Connie's tainted testimony, Dickenson's conviction should stand based upon the following untainted evidence: (1) Howard and Dickenson did not have an amicable relationship; (2) Dickenson was observed

entering Howard's apartment on the day of the killing; (3) Dickenson and Howard had a fight while Dickenson was in the apartment, and a gun was fired; (4) a body was observed through the front door while Dickenson was in the apartment; (5) Dickenson was present in Howard's apartment at the time the killing took place; (6) Paula and Ward saw no one in the alley during the time that Dickenson was in the apartment; (7) during the 5– to 10–minute period when neither Paula nor Ward could see the front door they were in the area of the apartment and observed no cars or persons in the alley; (8) no one was seen entering or leaving the apartment while Dickenson was in the apartment; (9) no cars other than Howard's white truck and Paula's car were seen in the alley while Dickenson was in the apartment; and (10) Dickenson emerged from the apartment with blood on his face.

We conclude that overwhelming evidence was presented at trial to prove that Dickenson killed Howard. Affirmed.

RINGOLD, A.C.J., and GROSSE, J., concur.

Review denied by Supreme Court October 6, 1987.