**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49103-6-II |
| Respondent, | |
| v. | |
| ROBERT DENGLER, JR., | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, P.J. — Robert Dengler Jr. appeals his convictions for one count of third degree child rape and three counts of third degree child molestation.[1]  Dengler argues that his counsel rendered ineffective assistance when he failed to argue for the admission of a witness's testimony as extrinsic evidence of a prior inconsistent statement under ER 613.  We hold that Dengler did not receive ineffective assistance of counsel and affirm Dengler's convictions.

---

[1] RCW 9A.44.079 and .089, respectively.

FACTS

I. BACKGROUND

In 2014, 14-year-old TM[2] accused Dengler, TM's 54-year-old uncle, of sexually abusing her while she lived in Dengler's home between June and October. The State ultimately charged Dengler with one count of third degree child rape and three counts of third degree child molestation.

II. TRIAL

A. STATE'S EVIDENCE

1. TM's TESTIMONY

At trial, TM testified that between approximately 2004 and 2006, she lived with Dengler and his then-wife, Corrie Dengler.[3] In June 2014, TM returned to live with Dengler.

TM testified that Dengler sexually abused her "[a]bout every third night-ish" when she lived with him; she described four incidents in detail. 3 Report of Proceedings (RP) at 117. During the first incident, a "week or two" after TM moved in, Dengler inappropriately touched her, including penetration, while she was lying on a "recliner chair" in the living room. 3 RP at 107, 108. TM detailed both the clothes that she and Dengler were wearing and that TM stood up and left the living room to "[go] to bed." 3 RP at 114. Dengler told TM, "'I don't want to be that creepy uncle.'" 3 RP at 114. The second incident occurred when Dengler "cuddle[d]" in TM's

---

[2] We use initials instead of names for victims of sex crimes to protect their privacy. Gen. Order 2011-1 of Division II, *The Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.).

[3] The Denglers were no longer married by the time of trial.

bed with her and touched her inappropriately. 3 RP at 118. The third incident occurred in October, when TM was preparing to leave for her homecoming dance. Dengler grabbed TM and said her dress made him "horny." 3 RP at 125.

The fourth incident that TM described occurred when Dengler carried TM from a futon in the living room to his bed, where he rubbed himself against her. TM could not recall all the details of the fourth incident because she had "tried to block [it] out." 3 RP at 129. TM also described another incident in October, sometime before the fourth incident, when TM had asked Dengler to take her to a resort. Dengler agreed, and after booking rooms, Dengler said, "'I want you as a daughter outside and I want you as a girlfriend in the room.'" 3 RP at 153. TM did not respond, angering Dengler, and he cancelled the reservation.

The day after the fourth incident, TM disclosed the abuse to her boyfriend and Rhianna Wilson, a woman who lived with TM's boyfriend, and the three made a plan to reveal the abuse to a school counselor the next day. TM claimed that Wilson told TM that the police would not "do anything" unless the abuse was "in the process of" happening. 3 RP at 136.

TM explained that she did not disclose the abuse earlier because she feared being put into foster care and because she "didn't think anything would happen." 3 RP at 141. TM testified that "[n]obody listens to me about anything" and that in "every case, nothing happens. . . . Nothing gets reported." 3 RP at 163. TM also stated that she disclosed the abuse to one of her friends in July, hoping that the friend would help TM, but that "[n]othing" had happened. 3 RP at 171.

2.    OTHER STATE'S WITNESSES' TESTIMONY

Wilson recounted TM's disclosures to her. TM had told Wilson that TM's uncle "touched her inappropriately" and described three or four separate incidents. 3 RP at 200. Wilson contacted

both Child Protective Services and police; the police "indicated they could not take any action unless . . . [TM] was actively being abused." 3 RP at 204.

Officer Ray Readwin testified that TM disclosed to him "general details" about Dengler sexually abusing her an unspecified number of times between June and October. 3 RP at 181. Officer Readwin opined that it was incorrect that the police would not respond to reports of sexual abuse unless the abuse was happening at the moment of the report.

When Officer Readwin offered to bring TM to a hospital, she declined because she had taken a shower and "'[t]here would be no evidence.'" 3 RP at 183. A subsequent examination by Nurse Michelle Breland revealed no injuries, which was inconclusive as to whether abuse had occurred.

## B.  EVIDENCE OF PRIOR ALLEGATIONS AND SUICIDE ATTEMPT

### 1.    PRETRIAL MOTIONS

Before trial, the State moved to exclude evidence related to incidents that occurred before June 2014, namely any prior sexual abuse or activity of TM, TM's suicide attempt, and TM's prior accusations of sexual abuse against people other than Dengler. The State argued that this evidence was irrelevant and overly prejudicial and that evidence related to prior sexual abuse or activity or prior accusations of sexual abuse was inadmissible under the rape shield statute. Dengler opposed the State's motion on the basis that he intended to call witnesses to testify that TM had made prior false accusations of sexual abuse against others and that such evidence was relevant and admissible under the rape shield statute. Dengler did not oppose the exclusion of evidence about the suicide attempt.

4

At the beginning of the trial, the trial court ruled that Dengler's witnesses would not be allowed to testify about prior false accusations against third parties. But the trial court stated that it might allow Dengler's witnesses to testify that TM had a reputation of being untruthful if Dengler made a sufficient offer of proof. The trial court ruled that it would not allow evidence of TM's suicide attempt.

2.      OFFER OF PROOF

After the State rested, Dengler made an offer of proof regarding TM's reputation for untruthfulness. Corrie[4]; Harry Tachell, Corrie's father; and Joseph Dengler, TM's father, testified outside the jury's presence as to the basis of their knowledge of TM's untruthful character.

Corrie testified that she and Dengler had been TM's foster parents between approximately 2003 and 2007. After approximately 2007, when TM returned to live with her mother, Corrie intermittently spoke with or visited TM. Between 2008 and 2014, Corrie explained that two to three times a year, she would hear of allegations that TM or her sister had been molested by different people. Corrie estimated a total of nine or ten different prior accusations, all of which Corrie had believed and at least two of which had resulted in criminal proceedings. Corrie also mentioned that she and Dengler "had been under the assumption [TM] had attempted suicide before he got her." 4 RP at 261.

In summer 2014, when TM lived with Dengler, Corrie resumed speaking with TM almost daily. TM told Corrie during one of their conversations that TM's suicide attempt had been "a ploy to get out of" TM's mother's house. 4 RP at 265. TM also told Corrie that "every one of"

---

[4] We refer to Corrie Dengler by her first name to avoid confusion.

the sexual abuse allegations had been a lie and that TM's mother had "made the girls say these things because . . . they could get out of there." 4 RP at 266. Although at one point Corrie said that TM admitted all the allegations were lies, Corrie also testified that TM told her two of the prior accusations had been true.

Corrie cut off contact with TM in October, after TM disclosed that Dengler had abused her. In Corrie's opinion, TM was "a liar," and Corrie had warned Dengler "to be cautious" with TM because TM would "do what she will to get her way." 4 RP at 267, 293.

3.      ER 608 RULING

After hearing Dengler's offers of proof, the trial court ruled that neither Corrie, Tachell, nor TM's father could testify about TM's reputation for untruthfulness in the community under ER 608. However, the trial court discussed Corrie's "credible" testimony about specific instances in which she learned that the prior accusations were false. 5 RP at 358. "[H]ad I understood the specificity of the offer of proof information," the trial court stated, "I would have ruled that [defense counsel] was allowed, on cross-examination, to cross-examine [TM] about whether or not the facts as described by [Corrie] did or did not happen." 5 RP at 358-59. The trial court ruled that Corrie would not be recalled no matter what TM said because ER 608 did not allow extrinsic evidence to be "prov[ed] up."[5] 5 RP at 362. After discussing its concerns, the trial court adjourned the trial for the parties to brief the issue under ER 608.

---

[5] ER 608(a) allows evidence of a witness's reputation for untruthfulness, but ER 608(b) generally bars the use of extrinsic evidence about specific instances of the witness's conduct to attack a witness's credibility. ER 608(b) does allow for cross-examination about specific instances of a witness's conduct relevant to the witness's credibility.

When the trial court reconvened, the State argued that information that TM had falsified prior accusations of sexual assault was inadmissible and requested that if questioning of TM were allowed, it be limited so that the questions asked would not result in "back door" admission of the inadmissible evidence. Dengler replied that he should be allowed to "cross-examin[e TM] about prior false allegations that she made without the followup of impeachment by specific instances of conduct that we all agree is not allowed." 6 RP at 392.

The trial court ruled that it would allow Dengler to recall TM as a witness and inquire about two matters raised by Corrie's testimony: "the false suicide allegations"[6] and prior allegations of abuse. 6 RP at 392. The trial court determined that TM's testimony that no one had believed her in the past when she made similar allegations opened the door to allow Dengler to ask whether TM had made prior allegations of "'[i]nappropriate conduct.'"[7] 6 RP at 401. Dengler could ask about whether "[TM] shared any of the situations with [Corrie] and if [TM] ever told [Corrie] that some of those accusations were actually not true but done for another reason. . . . [I]f [TM] says, 'I don't remember that; it didn't happen,' then so be it, and we're done." 6 RP at 393. In making its ruling, the trial court reemphasized that Corrie's testimony was impermissible extrinsic evidence under ER 608 and would not be allowed.

---

[6] At first, the trial court ruled that Dengler had to refer to whether TM's attempted suicide was false without using the word *suicide*, in light of a pretrial ruling to exclude references to "attempted . . . suicide." Clerk's Papers (CP) at 20. But the State withdrew its motion in limine to bar references to "attempted . . . suicide," and the trial court then ruled that Dengler could refer to the matter using the word *suicide*. CP at 20.

[7] The State argued that Dengler could ask whether TM made only prior *false* allegations.

### C.  DENGLER'S EVIDENCE

1.    TM'S TESTIMONY

Dengler called TM as one of his witnesses.  TM admitted that she had spoken to Corrie

shortly after returning to Dengler's home.  When Dengler inquired about the prior suicide attempt

and accusations, the following exchange occurred:

| | |
|---|---|
| [Dengler:] | [D]o you remember talking to [Corrie] about the suicide attempt? |
| [TM:] | I don't. |
| [Dengler:] | Do you remember her asking about it? |
| . . . . | |
| [TM:] | About why? |
| [Dengler:] | Right.  *Whether it was actually a real suicide attempt or it was something faked?* |
| [TM:] | *I don't recall.* |
| [Dengler:] | *Do you recall ever telling her that you had faked that suicide attempt in order to get out of your living arrangements?* |
| [TM:] | *No, that is not true.* |
| [Dengler:] | Okay.  All right.  *Do you remember, during your conversation with [Corrie], telling her about some of the prior assaults upon yourself by other people?* |
| [TM:] | Which one, which, like -- |
| [Dengler:] | Something prior to 2014, other incidents? |
| [TM:] | *No, I did not speak to her about that.* |
| [Dengler:] | Did you ever tell her that some of them were actually falsely made by yourself and some were true? |
| [TM:] | That is incorrect. |
| [Dengler:] | Okay.  What did you tell her about that? |
| . . . . | |
| [TM:] | I -- I didn't tell her any -- anything about any previous of June. |
| [Dengler:] | *Okay.  What did you tell her about the -- the suicide attempt?  Did you tell her what you did or some facts about it?* |
| [TM:] | *I guess.  I don't remember, so --* |
| | [Dengler:]  That's all the questions I have at this point. |

6 RP at 408-09 (emphasis added).  On cross-examination, TM confirmed that she had attempted

to commit suicide in June, immediately before returning to Dengler's home.  TM stated that she

had never made any false allegations of sexual misconduct and that her suicide attempt was not staged.

2.      DENGLER'S TESTIMONY

Dengler denied ever sexually assaulting TM.  He claimed that as punishment for TM lying about going to her boyfriend's house, he had placed TM "on restriction" the day before she disclosed the abuse at school.  Dengler also claimed that he allowed TM to book rooms at the resort but cancelled the reservations within minutes when he remembered that TM was "on restriction."  6 RP at 484.

## D.  JURY'S VERDICT AND SENTENCING

The jury found Dengler guilty on all counts.  Dengler was sentenced to concurrent 60-month sentences on each count and 36 months on community custody.  Dengler appeals.

## ANALYSIS

Dengler argues that his trial counsel rendered ineffective assistance when he failed to argue that under ER 613(b), the false allegations against others and staged suicide attempt[8] testimony was admissible.  Dengler acknowledges that the trial court allowed Dengler to question TM about the prior allegations and the suicide attempt under ER 608 but argues that his counsel should have relied upon ER 613, so that extrinsic evidence—the false allegation and staged suicide attempt testimony—would have been allowed.  We disagree.

---

[8] Because Corrie would have testified that TM said she had staged her suicide attempt, we refer to Corrie's proposed testimony as the "staged" suicide attempt testimony.  At trial, TM denied that she had staged her attempted suicide.

9

## I. Legal Principles

### A. Standard of Review

We review de novo claims of ineffective assistance of counsel, which present mixed questions of law and fact. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail, the defendant must show that his attorney's performance was deficient and that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If either prong of the test is not met, the defendant's ineffective assistance of counsel claim fails and the inquiry ends. *Strickland*, 466 U.S. at 697.

### B. ER 613 and ER 608

ER 613, related to witnesses' prior statements, allows the admission of extrinsic evidence of a witness's prior inconsistent statements in some circumstances. *See* ER 613(b). ER 613(b) states that

> [e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

ER 613(b) does not allow the admission of extrinsic evidence about a "collateral" matter. *State v. Dickenson*, 48 Wn. App. 457, 466-68, 740 P.2d 312 (1987). Extrinsic evidence allowed under ER 613(b) is not probative of substantive facts but allowed solely for impeachment. *State v. Clinkenbeard*, 130 Wn. App. 552, 569, 123 P.3d 872 (2005).

ER 608, related to evidence of a witness's character and conduct, allows a witness's credibility to be attacked by reputation evidence referring to the witness's character for truthfulness or untruthfulness. ER 608(a). Extrinsic evidence of specific instances of a witness's conduct is

inadmissible to attack or support the witness's credibility. ER 608(b). However, specific instances of a witness's conduct may,

> if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

ER 608(b).

## C. COLLATERAL MATTERS

"For purposes of [ER 613], prior inconsistent statements are not collateral, and extrinsic evidence is therefore admissible, if the statements have as their subject, (1) facts relevant to the issues in the cause, or (2) facts which are themselves probable by extrinsic evidence to discredit the witness," such as "bias, prejudice, or interest of the witness." 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 613.11, at 597 (6th ed. 2016). The test for whether a matter is collateral is "[c]ould the fact upon which error is based have been brought into evidence for a purpose independent of the contradiction?" *Dickenson*, 48 Wn. App. at 468. Courts have held that evidence a rape victim has accused others is not relevant and is thus inadmissible unless the defendant demonstrates that the prior accusation against others was false. *See State v. Demos*, 94 Wn.2d 733, 735, 737, 619 P.2d 968 (1980); *State v. Harris*, 97 Wn. App. 865, 872, 989 P.2d 553 (1999).

## II. ANALYSIS

Because it is not deficient performance to fail to make a motion that would be futile, Dengler must show that Corrie's testimony about the false allegations and staged suicide attempt would have been admitted under ER 613(b) had Dengler's attorney so argued. *See State v. Denny*,

11

173 Wn. App. 805, 811, 294 P.3d 862 (2013). To do so, Dengler must show that the trial court would not have ruled that the false allegation and staged suicide attempt testimony concerned a collateral matter.[9]

Corrie would have testified that, contrary to TM's trial testimony, TM had told Corrie that the suicide attempt was a ploy and that most of the prior allegations against others had been falsified. Dengler relies on his argument that the false allegation and staged suicide attempt testimony was relevant because it pertained to TM's credibility. But a witness's credibility is *always* in issue. ROBERT H. ARONSON & MAUREEN A. HOWARD, LAW OF EVIDENCE IN WASHINGTON § 7:06(2)(a) (5th ed. 2017). Dengler's counsel had to do more than argue that the evidence was relevant because it pertained to credibility: he had to establish that the matter was not collateral. *See Dickenson*, 48 Wn. App. at 468. That is, the matter must have been able to be "brought into evidence for a purpose independent of the contradiction." *Dickenson*, 48 Wn. App. at 468. Dengler fails to show that the false allegation and staged suicide attempt testimony was admissible under this test.

*State v. Simonson* is illustrative. *See* 82 Wn. App. 226, 234-35, 917 P.2d 599 (1996). In that case, the defendant was charged with child molestation and child rape and sought to introduce

---

[9] ER 613(b) requires that a foundation be laid for extrinsic evidence and that the extrinsic evidence actually be inconsistent with the witness's trial testimony. *Clinkenbeard*, 130 Wn. App. at 569. TM was given an opportunity to explain or deny that she had said that the suicide attempt was staged and that the prior accusations were false, and the prosecutor cross-examined TM immediately after her testimony. TM denied both that she and Corrie discussed the suicide attempt or prior allegations and that she had said that the suicide attempt was staged or that the prior allegations were false. Thus, both the foundational and inconsistency requirements were satisfied and whether Corrie's testimony would have been admitted rests upon whether the matter was collateral. *See Dickenson*, 48 Wn. App. at 467-68.

a police officer's testimony that the victim had told the officer that she and the defendant had penetrative intercourse multiple times per day. *Simonson*, 82 Wn. App. at 228, 231. The defendant contended that the officer's testimony could be admitted under ER 613 to impeach the victim's testimony that the defendant had molested her (without penetration) three times weekly. *Simonson*, 82 Wn. App. at 234-35. The court held that the officer's testimony was inadmissible on the molestation counts because the officer's testimony did not relate to nonpenetrative sexual intercourse. *Simonson*, 82 Wn. App. at 235. The officer's testimony showed "only a specific instance of conduct probative of untruthfulness," which was "not . . . provable by extrinsic evidence." *Simonson*, 82 Wn. App. at 235.

Here, TM testified that she had never stated that the prior accusations against others were false or that her suicide attempt was staged. If believed, Corrie's testimony about the false allegations and staged suicide attempt would have contradicted TM by showing that TM had, in fact, told Corrie that the prior accusations were false and that her suicide attempt was staged. Although these inconsistencies did somewhat discredit TM, they did so as to a specific instance probative of untruthfulness and not by directly contradicting TM's testimony accusing Dengler of raping and assaulting TM. As *Simonson* illustrates, Corrie's testimony was therefore inadmissible because it was collateral. *See* 82 Wn. App. at 235.

Further supporting the conclusion that Corrie's testimony was inadmissible for a purpose independent of the contradiction is the rule expressed in *Demos* and *Harris* that evidence of prior accusations against others is irrelevant where the prior accusations are not demonstrated to be false. *See Demos*, 94 Wn.2d at 737; *Harris*, 97 Wn. App. at 872. Although showing that sometimes TM said that the allegations were false and sometimes that they were true, Corrie's

testimony did not necessarily demonstrate that TM had falsified prior allegations, and thus Corrie's testimony was not admissible.

Dengler argues that the false allegation and staged suicide attempt testimony would have been admitted because it was evidence of a motive to lie. It is true that evidence tending to show a motive to lie is not collateral and may be used to impeach. *See State v. Roberts*, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980); *see also* 5A TEGLAND, *supra*, § 613.11 (evidence is not collateral if it shows the witness's "bias, prejudice, or interest"). But Dengler's argument overlooks that evidence admitted under ER 613(b) "is not probative of the substantive facts encompassed by the evidence." *Clinkenbeard*, 130 Wn. App. at 569. Under this rule, the false allegation and staged suicide attempt testimony would not have been admitted as proof that TM had, in fact, falsified accusations or staged her suicide attempt in order to leave her home and thus would not have established that TM had a motive to lie when she accused Dengler of abusing her.

The false allegation and staged suicide attempt testimony could not have been admitted for a purpose independent of the contradiction and accordingly was collateral. *See Dickenson*, 48 Wn. App. at 468. Further, the false allegation and staged suicide attempt testimony did not establish a motive for TM to lie. For these reasons, a motion to admit Corrie's testimony about the June conversation under ER 613(b) would have been futile.[10] Dengler fails to establish that his counsel rendered deficient performance, and our inquiry ends. *See Strickland*, 466 U.S. at 697.

---

[10] Because the right to present a defense does not include the right to present inadmissible evidence, we also reject Dengler's cursory argument that his right to present a defense was violated. *See State v. Aguirre*, 168 Wn.2d 350, 363, 229 P.3d 669 (2010).

No. 49103-6-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

LEE, J.

MELNICK, J.