UNITED STATES of America, Appellee,

v.

Marvel Tyrone MORGAN, Appellant.

No. 76–3078.

United States Court of Appeals,
Ninth Circuit.

June 3, 1977.

Laurence B. Finegold, argued, Seattle, Wash., for appellant.

Jack Meyerson, Asst. U. S. Atty., Seattle, Wash., David E. Wilson, Asst. U. S. Atty., argued, Seattle, Wash., for appellee.

Before WRIGHT, KILKENNY and ANDERSON, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant was indicted, tried by a jury and convicted on Count One of violating 18 U.S.C. §§ 2 and 1006 [aiding an officer of an institution insured by the Federal Savings and Loan Insurance Corporation in the receipt of an illegal kickback] and on Count Two of violating 18 U.S.C. § 1001 [falsifying a document in connection with the above transaction].[1]

## BACKGROUND

In 1971, the Didco Corporation [Didco] was a Seattle, Washington, corporation engaged in land development. It had a number of subsidiary corporations, one of which was the Highland Memorial Park Company whose principal asset was a tract of land suitable for cemetery purposes near Everett, Washington. This tract was known as View Crest Abbey [Abbey]. To develop the first phase of the cemetery operation at Abbey, Didco arranged short term or "interim" financing with the Northwest Mortgage Company [NWM] and secured an agreement that NWM (represented by John Teutsch and Mort Whittaker) would seek out long-term financing for Didco in the amount of $360,000.00. This long-term financing was ultimately arranged by NWM

---

1. These statutory prohibitions are considered in one of our most recent cases, *United States v. Chenaur*, 552 F.2d 294 (CA9 1977).

through the Greenwood Savings and Loan Association [GS&L], an association organized and existing by virtue of the laws of the state of Washington, Title 33, Revised Code of Washington.

The disposition of a seven point loan fee [7% of face amount of loan] on this transaction forms the basis for the charge in Count One. This fee was a compromise figure and was subject to lengthy negotiations prior to an agreement. Teutsch felt that a total fee of five points was proper, considering the then market conditions. Morton Whittaker who was Teutsch's corporate superior, was of the opinion that the fee should be ten points. McMahon was of the same belief. The seven point fee was an outgrowth of these various positions. The appellant was a former employee of GS&L and held himself out as a broker for the GS&L/Didco Loan. His father, Marvel S. Morgan, was president of GS&L and, needless to say, this fact did not make appellant's job more difficult. All parties agree that the seven point loan fee was paid, but their stories conflict on the question of how much was paid to each and for what purpose. The evidence is clear that one point was paid at the time of the commitment by GS&L [2] and that it retained two points as its fee. Consequently, on the closing of the loan, four points or approximately $14,400.00 remained to be distributed. This amount was paid in full to McMahon, a friend of Whittaker who evidently was acting as a co-broker with appellant.

McMahon testified for the government and said that he went to the appellant's residence shortly after the closing and that they argued over whether the split of the $14,400.00 should be fifty-fifty or in some other ratio. In any event, the appellant ended up with $11,400.00. McMahon testified that the appellant claimed that he needed the extra amount to make provision for his father and one Connelly, a vice-president of GS&L. Appellant's father testified at trial and conceded that he did in fact receive either $500.00 or $1,000.00 from his son at the time of the cemetery deal, but that it could have been in repayment of a personal loan he had made to his son. He acknowledged, however, his prior grand jury testimony where he testified to the effect he knew that the payment from the appellant was "for having Greenwood [GS&L] get involved" in the cemetery loan.

The appellant's own explanation of the division of the sum was, at best, extremely illusory and unsatisfactory. He denied or could not remember important parts of the transaction, but did say that the money delivered to his father was in repayment of a personal loan.

The alleged substitution by the appellant in GS&L files of a 3% closing statement for the original 7% statement is the basis of the charges in Count Two. The government's case consisted primarily of the testimony of Whittaker, who had been granted immunity, and Patrick, a former employee of NWM. Patrick overheard a conversation between Whittaker and the appellant regarding the preparation of the false 3% closing statement in which the appellant admitted to the preparation of the false statement. The testimony of Whittaker is more troublesome. Before the grand jury, in response to leading questions, he testified that appellant admitted that he placed a different closing statement in the GS&L file. On the trial, however, he was evasive and obviously an unwilling witness despite the grant of immunity. The appellant himself testified that he could not honestly say whether he did or did not replace the 7% statement.

The above brief overview of facts is sufficient to understand the issues appellant raises on this appeal.

## ISSUES

I. Was it error to receive in evidence the previous inconsistent grand jury testimony of certain government witnesses?

II. Was it error to refuse the appellant's requested instruction as to witnesses granted immunity?

III. Was the federally insured status of GS&L adequately established?

2. There is evidence that the appellant received 50% of this payment.

IV. Did the trial court correctly interpret its own local rule?

I.

While examining its own witnesses, the government, on several occasions, resorted to prior grand jury testimony to impeach the witness or to refresh his recollection on what he had said in the previous proceeding. For example, when appellant's father, Marvel Morgan, was called by the government, he was indefinite and uncertain on the name of the person who first brought the cemetery loan transaction to GS&L. In his grand jury statement, however, Morgan clearly stated that the appellant was the person who brought the loan to the witness. Later, when again indefinite and evasive about the money he had personally received from the appellant, his attention was called to his testimony before the grand jury to the effect that appellant had given him $1,000.00, which was received in the nature of a side payment for GS&L getting involved in the cemetery loan.[3] Although not to be applauded, the prosecutor's questions to the witnesses in the grand jury proceeding were not, as argued by appellant, unduly suggestive or conclusory.

All the government witnesses who were indefinite as to what occurred before the grand jury or evasive in their answers at the trial were interrogated by the government as to their previous testimony following the same pattern as above.

■ Initially, appellant intimates that the government was improperly allowed to impeach its own witnesses. This argument is without merit. Rule 607, FRE,[4] eliminated the former roadblock preventing a party from impeaching his own witness.[5] *See United States v. Dixon*, 547 F.2d 1079, 1082 (CA9 1976). The advisory note makes it clear that the rule means just what it says.[6]

Next, the appellant makes a number of objections based on hearsay grounds. Rule 801(d)(1)(A), FRE,[7] provides specific justification for the government's use of the grand jury testimony as direct evidence. On the record here presented, the Rule is a complete answer to appellant's contention that the sworn testimony before the grand jury was not admissible.[8] The legislative history behind this rule was fully reviewed in our construction of the rule in *United States v. Castro-Ayon*, 537 F.2d 1055 (CA9

---

**3.** A typical example of Morgan's Grand Jury testimony follows:

"Q. Wasn't it a side payment to you and Biff Connelly for Greenwood's getting involved in this cemetery loan?
A. Well, yes, that's what it amounts to.
Q. The payment from Tye [appellant] to you was in cash?
A. I do not remember."

\* \* \* \* \* \*

"Q. Who did you negotiate the side payment with?
A. Tye [appellant]. He and I worked it back and forth in the apartment house. Tye came out there and I can't recall if it was cash or check, he gave me a thousand dollars."

\* \* \* \* \* \*

"Q. You knew that the $1,000 was for having Greenwood get involved in this cemetery loan?
A. Yes, right, I knew what it was for."
[R.T., pp. 269–270].

**4.** Federal Rules of Evidence.

**5.** *Rule 607 WHO MAY IMPEACH* "The credibility of a witness may be attacked by any party, including the party calling him."

**6.** *Notes of Advisory Committee on Proposed Rules* "The traditional rule against impeaching one's own witness is abandoned as based on false premises. A party does not hold out his witnesses as worthy of belief, since he rarely has a free choice in selecting them. Denial of the right leaves the party at the mercy of the witness and the adversary. If the impeachment is by a prior statement, it is free from hearsay dangers and is excluded from the category of hearsay under Rule 801(d)(1). . . ."

**7.** Rule 801(d)(1)(A).

"(d) *Statements which are not hearsay.* A statement is not hearsay if—
*(1) Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or . . ."

**8.** The notes of the Conference Committee clearly indicate that "[t]he rule as adopted covers statements before a grand jury."

242

1976), *cert. denied* 429 U.S. 983, 97 S.Ct. 501, 50 L.Ed.2d 594. Appellant's reliance on *United States v. Tavares,* 512 F.2d 872 (CA9 1975), is totally misplaced as demonstrated by the discussion of *Tavares* in *Castro-Ayon.* 537 F.2d at 1058.

■ Since the witnesses' sworn statements before the grand jury and in deposition were properly admissible under the rules, they could be received not only for impeachment purposes, but also as substantive evidence of the appellant's guilt. Consequently, the grand jury statements of the witnesses, in particular the evidence with reference to the father's participation in the $1,000.00 transaction, were direct evidence in support of the government's claim. *See United States v. Librach,* 536 F.2d 1228, 1232 (CA8 1976), *cert. denied* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308; *United States v. Blitz,* 533 F.2d 1329, 1345 (CA2 1976), *cert. denied* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79. Moreover, we must reject the appellant's claim that error was committed when the trial court allowed the prosecution to quote some of the grand jury testimony during closing argument. *Cf. Librach* at 1232.

■ Next, the appellant urges that at the time the grand jury testimony was offered, it was *not yet* inconsistent [as required by the rule] with the witness's trial testimony. We certainly do not wish to encourage the indiscriminate use of prior-prepared statements. We feel, nevertheless, that trial judges must retain a high degree of flexibility in deciding the exact point at which a prior statement is sufficiently inconsistent with a witness's trial testimony to permit its use in evidence. While the rule itself contains no guidelines as to how we are to determine "inconsistency", we find guidance in Judge Weinstein's Treatise on Evidence [4 Weinstein's Evi-

dence, Matthew Bender, P. 801–76—801–76.1 (1976)]:

". . . . Rule 801(d)(1)(A) is silent on whether the impeachment case law test of 'inconsistency' should be read into this new rule giving prior inconsistent statements substantive effect. Fortunately, this presents far less of a problem than it would in some jurisdictions which take the highly technical view of finding an inconsistency only when this is apparent on the face of the two statements and the only possible inference. The better view, urged by Wigmore, McCormick, and others, and followed by the federal courts, allows the prior statement whenever a reasonable man could infer on comparing the whole effect of the two statements that they had been produced by inconsistent beliefs. In other words, the keystone for impeachment use is relevancy—would the prior statement of the witness help the trier of fact evaluate the credibility of the witness, . . . The approach under Rule 801 should be the same. Here the question is not whether the statement is helpful in evaluating credibility, but whether it is helpful in resolving a material, consequential fact in issue. . ." [Footnotes omitted].

Using this approach, we have no doubt that the trial judge correctly allowed the government to use in evidence the grand jury testimony herein challenged.[8a]

## II.

■ The appellant requested and the court gave a specific instruction on the weight to be given the testimony of an accomplice.[9] Taking the position that the accomplices who appeared before the grand jury and were granted immunity were informers [after they were granted immuni-

---

8a. *See also United States v. Champion Int'l. Corp.,* 75–2866/2867/2873, 557 F.2d 1270 (CA9 1977).

9. "An accomplice is anyone who knowingly and voluntarily cooperates with, aids, assists, advises, or encourages another in the commission of a crime.

"An accomplice in the commission of a crime is a competent witness and the government has a right to use an accomplice as a witness.

"The testimony of an alleged accomplice should, however, be received with caution and weighed with care. You should give it such weight as in your judgment it is fairly entitled to receive."

ty], the appellant also asked the court to give the Devitt & Blackmar instruction shown in the footnote.[10] The trial court felt that the witnesses appearing before the grand jury and later testifying for the government under grants of immunity did not fall within the definition of informer as used in the requested instruction. Though our circuit has taken the same position on somewhat related facts in *United States v. Busby,* 484 F.2d 994 (CA9 1973), the appellant ignores that authority and argues that *United States v. Leonard,* 161 U.S.App.D.C. 36, 494 F.2d 955 (1974) controls and that it was reversible error for the trial court to refuse the informer instruction. We disagree.

Preliminarily, it should be noted that the trial court in *Leonard* gave neither an accomplice nor an immunity instruction. This is significant as the court there pointedly observed that there would be no need on retrial for the trial judge to give both instructions, suggesting instead that the trial court merge the two. Moreover, there is no significant distinction between a cautionary instruction on the testimony of an accomplice and a cautionary instruction on one granted immunity. In both instances, the jury is instructed that the testimony "be received with caution and weighed with care." Consequently, whether we treat the government witnesses as accomplices or as persons granted immunity, or both, is immaterial because the instruction would be essentially the same. *Leonard, supra,* 161 U.S.App.D.C. 36, 494 F.2d at 961–62. We are on rather solid ground in "hindsighting" that the *Leonard* court would not have reversed had the trial court given a proper accomplice instruction such as that given here. In any event, we are unable to detect any prejudice as the appellant was allowed to fully develop the immunity issue on cross-examination and forcefully argue it in summation.

**III.**

█ Under this assignment of error, the appellant argues that the government failed to prove that GS&L was a federally insured savings and loan association as required under 18 U.S.C. § 1006. Appellant's only objection to the "xerox" copy of the Certificate of Insurance was that "[T]hat is not the original and I don't know where the original is." Under the provisions of Rule 1003, FRE, "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." There is nothing in the record to indicate that the appellant ever questioned the authenticity of the original; nor is there anything to indicate that under these particular circumstances it would be unfair to admit the copy into evidence. Rule 1001(4)'s definition of a "duplicate" includes counterparts produced by means of photography and the authorities fully support the admissibility of the type of duplicate here in issue. *See United States v. Rodriguez,* 524 F.2d 485 (CA5 1975), *cert. denied* 424 U.S. 972, 96 S.Ct. 1474, 47 L.Ed.2d 741 (1976). *Cf. United States v. Gerhart,* 538 F.2d 807, 810 (CA8 1976).

On appeal, for the first time, appellant suggests that the person who identified the Insurance Certificate was an officer of a branch office of GS&L, rather than the principal office and is thus not qualified. This argument is frivolous. It is the state savings and loan association, rather than its individual branches, which is insured under the provisions of 12 U.S.C. § 1726(a). *Cf.* RCW §§ 33.08.110 and 33.12.010(12). Although the copy of the Certificate of Insurance introduced into evidence was issued in 1966, it is clear from the official emblem on government's exhibits 4 and 9 that GS&L

---

**10.** "§ 12.02 TESTIMONY OF INFORMER—INTERESTED WITNESS

The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against defendant."

remained insured throughout the transactions here under scrutiny.

### IV.

We have considered appellant's collateral arguments and contentions, including his contention that the district court erroneously construed its own local rule, CrR 16(a).[11] The rule was never intended, as argued by the appellant, to restrict in any manner the testimony of a defendant's former business associates. Moreover, we question the appellant's standing to object inasmuch as the rule was obviously designed for the benefit of the court and not the individual defendant. *Cf. United States v. Brown*, 522 F.2d 10 (CA9 1975). The district court was correct in rejecting the appellant's contentions.

### CONCLUSION

Appellant had a fair trial in the district court. The judgment must be affirmed.

IT IS SO ORDERED.

---

11. "If the government intends to use at trial an admission or confession made by the defendant, the United States States Attorney shall advise the court thereof in writing at least ten days prior to trial, exclusive of Saturdays, Sundays, and Holidays."