[No. 22496-8-II. Division Two. April 23, 1999.]
THE STATE OF WASHINGTON, *Respondent*, v. SIRRONE TERRELL NEWBERN, *Appellant*.

*Pattie Mhoon,* for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney, Barbara L. Corey-Boulet, Deputy,* and *Alicia Swanlund, Legal Intern,* for respondent.

SEINFELD, J. — A jury convicted Sirrone T. Newbern of attempted murder in the second degree. Newbern appeals, claiming the trial court erred in denying his request for a jury instruction on reckless endangerment and in admitting scientific, expert, and hearsay evidence. Finding that reckless endangerment is not a lesser included offense of attempted murder and finding no other reversible error, we affirm.

## FACTS

Newbern shot his girl friend, Lakenya Jones, with a handgun while she was standing in front of her house talking on the telephone to her former boyfriend, A.J. The bullet passed through Jones's chest; it then went through the front door and the living room, where it shattered a glass vase; and finally entered the kitchen where it lodged in a small refrigerator on the kitchen's back wall.

The next morning, Detective Bomkamp interviewed Jones at Madigan Hospital.[1] She told the detective that before the shooting she had received a telephone call from a former boyfriend. She said she was in her bedroom with her sister speaking on the phone when Newbern came in,

---

[1]We present the contents of Bomkamp's interviews with Jones as background for our discussion of certain evidentiary rulings. We do not provide Jones's statements as evidence of Newbern's conduct. *See State v. Hancock*, 109 Wn.2d 760, 748 P.2d 611 (1988) (acknowledging potential for misuse of impeachment evidence as substantive evidence).

told her to hang up, and pointed a gun directly at her. She said she left the bedroom and walked outside where she stood on the front step, still talking on her portable phone. Jones also said that Newbern followed her outside and told her to get off the phone and that when she replied, "No," he lifted the gun to shoulder height and pulled the trigger one time. According to Jones, the gun fired and a bullet struck her in the chest.

Jones was transferred to Harborview Medical Hospital where Bomkamp visited her two days later and took a recorded statement. According to the statement, when she was on the phone, "Sirrone pulled the gun out on me toward my head, but my sister walked in and he took it down so after that, I walked outside . . . ." This was about three minutes before the shooting.

Jones then described the events outside, as follows:

I said, Sirrone, why you keep pullin' the gun out on me. He didn't say nothin', he just backed up.

. . . .

. . . [H]e seemed like he was mad at me for some reason cause way before all this had happened, he poured beer all on me.

. . . .

He told me to get my ass off the phone. I told him, no, you know, I'm not gettin' off the phone cause it's not a every day thing that I get to talk to A.J., you know.

. . . .

He just, that's when, that's when he just took his gun out, like outta his pants or whatever and was . . . .

. . . .

. . . [T]hen he just turned it, pointed it at me and shot.

Exhibit 38.

Bomkamp asked: "It sounds like you don't have any doubt the gun was pointed directly at you." Jones responded,

"Just at me." She said that Newbern was standing about five and a half feet away and the gun's barrel was about four feet away.

Meanwhile, after the shooting, Newbern fled the scene and hid in a friend's basement. About a day later, a police SWAT team discovered his whereabouts, entered the residence, and took him into custody. Newbern then admitted that he had been holding the gun when it fired, but he claimed that it discharged by accident.

The State charged Newbern with one count of attempted murder in the first degree, RCW 9A.32.030(1)(a) and RCW 9A.28.020, while armed with a firearm, RCW 9.41.010. The matter proceeded to trial about three months later.

Jones testified at trial, acknowledging that she had received a telephone call from A.J. before the shooting. But at trial, Jones insisted that Newbern had not told her to get off the phone and was not jealous when she spoke to A.J., that she did not see Newbern with a gun when she was outside, and that the shooting was an accident.

The State then impeached Jones with the statements she had made to Bomkamp. In response to this questioning, Jones said she had no memory of speaking with Bomkamp at Madigan Hospital and had not been truthful in her statement at Harborview. Specifically, she claimed that her statements that Newbern was angry with her, told her to get off the phone, and pointed the gun at her when she was outside were all untrue. Jones claimed that she made the untruthful incriminating statements to the detectives to "get back" at Newbern.

Over Newbern's hearsay objection, Bomkamp testified about the Madigan Medical Hospital interview, saying that Jones told him that Newbern pointed the gun at her twice in the space of about five minutes and shot her after she refused to get off the telephone. Bomkamp also produced the tape recording of the Harborview Medical Hospital interview, which the trial court admitted into evidence over Newbern's hearsay objection. The court reasoned:

> Well, while the chronology of this statement is, in my

opinion, somewhat consistent, very consistent, actually, with the chronology that Lakenya Jones and other witnesses have testified to, the entire tone and thrust of this statement is totally contradictory to what she attempted to portray at trial. It gives the exact opposite impression, in my opinion, and, in its totality, is simply an inconsistent version of what the jury has heard on the witness stand, and the jury ought to have the opportunity to hear what she said at another time, which is a totally different version from what she said to them in the courtroom.

The trial court later elaborated:

Expanding a little bit on my ruling, I want to say also that, not only is the overall thrust of the statement inconsistent, but those areas that are consistent are either areas that are of assistance, actually, to the defense or are of no consequence. They're just, in effect, stage setting sorts of items that, in the Court's opinion, don't prejudice the defendant in any way.

Detective Gagner, a detective and technical accident reconstructionist for the Washington State Patrol, also testified for the State. He explained that he had measured the trajectory of the bullet with a device called an electronic total station (ETS), a surveyor's tool that is used for precision surveying work. He told the jury that the Department of Transportation uses the ETS for surveying and that, consequently, most of them probably would have seen it sitting on a three-legged tripod on the highway.

Gagner said that he participated in a four-hour block of training for ETS operators in 1995 and since then has trained other officers on its use. The ETS takes a measurement by shooting an infrared beam that hits a prism at the location to be measured. The beam then reflects back at a different frequency. From this, the ETS can calculate the distance and slope of a trajectory, providing the information for pinpoint drawings.

Without objection, Gagner produced and explained the information on two pinpoint drawings, Exhibits 40 and 41, he had made using the ETS. The drawings indicated the

trajectory of the bullet from Jones's entry and exit wounds, through the door to the refrigerator in the kitchen.

During Gagner's testimony, the State moved to admit Exhibit 41. Newbern said that he did not object to its admission "for illustrative purposes, but for evidence, I am." He argued that the drawing was not sufficiently reliable because the bullet might have struck an internal organ or bone in Jones's body, which would have caused a change in the trajectory. The trial court admitted Exhibits 40 and 41 after allowing Newbern time to further research the law on the issue.

Following Gagner's explanations of the exhibits, the State asked him an opinion question. Newbern then objected on the basis that Gagner had not been qualified as an expert "to trajectory, just that he took the measurements." After the trial court sustained on the basis that the question was leading and that the State needed to lay a further foundation, the State did not ask for any further opinions.

On the fifth day of trial, the absence of defense witnesses delayed the start of proceedings. The trial court told the jury about the delay, as follows:

> Apparently, we're not ready to proceed.
>
> I'm extremely frustrated. I set this at 10:00 so we would be ready to proceed, and still we're not. So all I can tell you is we're going to wait, and I'll let you know just as soon as we have a witness available. Again, I apologize and appreciate your willingness to sit through this. I know it's rude and it's a discourtesy to you, but we're just going to have to put up with it a bit.
>
> So I'll let you know as soon as we have a witness available. We'll be at recess.

Newbern objected to the trial court's comments and moved for a mistrial or at least a curative instruction. Before the trial resumed, the court advised the jury:

> Ladies and gentlemen, thank you for your patience. We are prepared to proceed.

I want to remind you, however, before we proceed of an instruction that I gave you early on in this case, and, in fact, I think a couple of times. I want to be sure that none of the delays that may happen during this trial are in any way part of your deliberative process, or that you make any assumptions about why we're having delays or that you have any ill will towards any of the participants in this trial, be it attorney or party or anybody else. Don't let that be a part of your decision making in any way, shape, or form, please.

If I intimated to you that I was distressed, I am distressed, but it's not with any particular individual or party in this particular lawsuit. I'm distressed because of your having to waste your time back in this jury room, and for no other purpose, and you should read no more in to it.

With that, if the defense is ready, you may call your next witness.

Newbern then renewed his motion for a mistrial, indicating that he was dissatisfied with the trial court's instruction and sensed animosity from the jury. The trial court denied the motion.

Newbern sought a jury instruction on reckless endangerment in the second degree, arguing that it was a lesser included offense of attempted murder in the first degree. The trial court declined to give the requested instruction.

During deliberations, the jury asked to listen to Jones's taped statement. The court brought the jury into the courtroom and played the tape for it. Subsequently, the jury found Newbern guilty of the lesser included offense of attempted murder in the second degree while armed with a firearm.

## DISCUSSION
### I. RECKLESS ENDANGERMENT INSTRUCTION

Newbern, citing *State v. Berlin*, 133 Wn.2d 541, 550, 947 P.2d 700 (1997); *State v. Warden*, 133 Wn.2d 559, 562-63, 947 P.2d 708 (1997); and *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978)), contends the trial court erred

by not instructing the jury that reckless endangerment is a lesser included offense to attempted murder in the first or second degree.

█ A defendant is entitled to an instruction on a lesser included offense if (1) each of the elements of the lesser offense is a necessary element of the offense charged (the legal prong), and (2) the evidence in the case supports an inference that the defendant committed the lesser crime (the factual prong). *Berlin*, 133 Wn.2d at 545-46; *Workman*, 90 Wn.2d at 447-48. Here, the State concedes that Newbern has met the factual prong of the *Workman* test but it contends that he has failed to meet the legal prong.

█ When reviewing the legal prong, we ask "if it is possible to commit the greater offense without having committed the lesser offense[; if so] the latter is not an included crime." *State v. Roybal*, 82 Wn.2d 577, 583, 512 P.2d 718 (1973) (citation omitted); *State v. Pelkey*, 109 Wn.2d 484, 488, 745 P.2d 854 (1987); *State v. Bishop*, 90 Wn.2d 185, 191, 580 P.2d 259 (1978). Thus, here, we must determine if the commission of attempted murder will invariably result in the commission of reckless endangerment. *State v. Harris*, 121 Wn.2d 317, 326, 849 P.2d 1216 (1993); *State v. Jackson*, 112 Wn.2d 867, 878, 774 P.2d 1211 (1989).

Although we find no Washington case holding that reckless endangerment is a lesser included offense of attempted murder, courts in other jurisdictions have determined that it is not because it is possible to attempt a murder without creating a risk to human life that rises to reckless endangerment. *State v. Palmer*, 8 Conn. App. 496, 513 A.2d 738, 742 (1986); *People v. Ramirez*, 55 N.Y.2d 708, 431 N.E.2d 623, 624 (1981). We agree with these cases.

"A person is guilty of reckless endangerment in the second degree when he or she recklessly engages in conduct . . . which creates a substantial risk of death or serious physical injury to another person." Former RCW 9A.36-

.050(1).² "A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation." RCW 9A.08.010(c).

"A person is guilty of an attempt to commit crime if, with intent to commit a specific crime, he does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). Factual or legal impossibility is not a defense to a charge of criminal attempt. RCW 9A.28-.020(2).

A substantial step is an act strongly corroborative of the actor's criminal purpose, such as lying in wait, searching for or following the intended victim of the crime, enticing or seeking to entice the intended victim to the planned site of the crime, reconnoitering the planned site of the crime, unlawfully entering the place where the actor intends to commit the crime, and possessing materials to be used in the crime. *Workman*, 90 Wn.2d at 451-52 n.2 (citing MODEL PENAL CODE § 5.01(2) (Proposed Official Draft, 1962)). This broad "substantial step" definition gives police the flexibility to intervene to prevent a crime when the defendant's criminal intent becomes apparent. *Workman*, 90 Wn.2d at 452 (citing *State v. Woods*, 48 Ohio St. 2d 127, 357 N.E.2d 1059, 1063 (1976)).

Because of the broad definition of "substantial step," it is possible to commit attempted murder without committing reckless endangerment. For example, one might lie in wait for the intended murder victim who, unknown to the perpetrator, is out of town. Because impossibility is not a defense, the perpetrator could be guilty of attempted murder although he did not actually harm the intended victim or place him at risk. *See Palmer*, 513 A.2d at 742; *Ramirez*, 431 N.E.2d at 624.

Thus, reckless endangerment is not a lesser included of-

---

²Effective July 1, 1997, RCW 9A.36.050(1) was amended to delete the phrase "in the second degree."

fense of attempted murder. Consequently, the trial court did not err in declining to instruct on reckless endangerment.

## II. Scientific Evidence
### A. Admissibility

The State presented the ETS evidence in an effort to show Newbern's position at the time the gun fired. Newbern, citing *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 46 (D.C. Cir. 1923), claims it was error to admit the ETS evidence.

We apply the abuse of discretion standard when reviewing evidentiary rulings. *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997). A trial court abuses its discretion when its actions are unreasonable or based upon untenable grounds or reasons. *Id.*

Testimony on experimental scientific procedures is admissible only if there is general acceptance in the scientific community of the underlying theory or principle. *Frye*, 293 F. at 1014. Washington applies the *Frye* test in criminal cases. *State v. Copeland*, 130 Wn.2d 244, 255-61, 922 P.2d 1304 (1996); *State v. Jones*, 130 Wn.2d 302, 306-07, 922 P.2d 806 (1996).

■ ■ The State, citing *State v. Florczak*, 76 Wn. App. 55, 72, 882 P.2d 199 (1994), contends Newbern failed to preserve this issue at trial. We review an error raised for the first time on appeal only if it involves an issue of constitutional magnitude. *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988); *State v. Jones*, 71 Wn. App. 798, 820, 863 P.2d 85 (1993); RAP 2.5(a)(3). Failure to lay an adequate foundation under *Frye* does not create manifest constitutional error. *Florczak*, 76 Wn. App. at 72; *see also Jones*, 71 Wn. App. at 820-21 (failure to specifically object to an inadequate foundation under *Frye* will not preserve the issue for appeal).

Here, Newbern did not object to Gagner's testimony as to the bullet's trajectory; he objected only to the diagrams

as substantive evidence, claiming they were not reliable. Because he did not invoke *Frye* or otherwise argue that the evidence was not accepted within the scientific community and because he does not raise a constitutional argument, we decline to review this assignment of error.[3]

## B. Judicial Notice

Newbern, citing *State v. Duran-Davila*, 77 Wn. App. 701, 705-06, 892 P.2d 1125 (1995) and *State v. Peterson*, 39 Wn. App. 524, 693 P.2d 757 (1985), asserts that the trial court inappropriately took judicial notice that there was a sufficient scientific basis to admit Gagner's drawings of the bullet trajectory. Newbern argued at trial that the measurements were not reliable because the bullet's trajectory could have been influenced by unknown factors, such as Jones's exact position at the time she was shot, and the bullet's impact with Jones's internal organs, the door, and the glass vase. But Newbern did not contend that the scientific theory supporting the ETS was insufficient.

The trial court explained its ruling, stating:

> Well, there certainly is the variability factor that the defense has alluded to in that the trajectory may have been affected by the bullet passing through Ms. Jones and through the door in the house.

> Yet, still, there is relevant evidence, I believe, in the respective position of Ms. Jones in relation to the house, in relation to the door, and to the general area where the bullet went, which is into the kitchen. I think there is sufficient scientific basis in the measurements.

> The diagrams, as established by testimony, are to scale, and that alone is of some benefit in determining the relative layout of the house, the stoop in relation to the door, and the door in

---

[3]The *Frye* test does not apply to methods that do not involve novel or experimental scientific procedures. *State v. Ortiz*, 119 Wn.2d 294, 311, 831 P.2d 1060 (1992). Thus, arguably, *Frye*, was not applicable to the ETS, which, according to the evidence, is a well-accepted surveying tool that has been in use for some period of time. The police use it to plot the trajectory of a bullet more precisely than they could do manually.

relation to the interior of the house. And so I am going to admit 41 and 40 and let them go back to the jury.

Newbern did not raise judicial notice as an issue at trial and the trial court did not characterize its ruling as based upon judicial notice. *See Duran-Davila*, 77 Wn. App. at 706; *Peterson*, 39 Wn. App. at 529 (error for court to take judicial notice of disputed facts). As noted above, we review an error raised for the first time on appeal only if it involves an issue of constitutional magnitude. *Scott*, 110 Wn.2d at 687. Because again Newbern merely restates the *Frye* test argument without providing a supporting constitutional theory, this issue is not properly before us. *Jones*, 71 Wn. App. at 820; RAP 2.5(a)(3). Further, the weight of the trajectory evidence was a question for the jury. *State v. Mosley*, 84 Wn.2d 608, 611, 528 P.2d 986 (1974). Consequently, the trial court did not err in admitting the ETS drawings.

## C. Expert Witness

Newbern also attacks Gagner's testimony and drawings on the basis that Gagner did not qualify as an expert.

The evidence rules allow for the admission of expert testimony under the following circumstances:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 702. "Under this rule, the trial court has discretion to admit expert testimony if the witness qualifies as an expert and if the expert testimony would be helpful to the trier of fact." *State v. Russell*, 125 Wn.2d 24, 51, 882 P.2d 747 (1994); *State v. Kalakosky*, 121 Wn.2d 525, 541, 852 P.2d 1064 (1993).

Practical experience may be sufficient to qualify a witness as an expert under ER 702. *State v. Ortiz*, 119 Wn.2d

294, 310, 831 P.2d 1060 (1992); *State v. Smith*, 88 Wn.2d 639, 647, 564 P.2d 1154 (1977). Gagner testified that in 1995 he had four hours training on operating the ETS and recording measurements with it, and then later taught other personnel how to operate it. Gagner's testimony indicated that the ETS is relatively simple in its design and operation.[4]

After Gagner had testified extensively without objection to his qualifications and about the ETS's design and operating principles, the State asked him whether the trajectory matched Jones's entry and exit wounds and the hole in the door. At this point, Newbern objected on the basis that Gagner was not qualified as a trajectory expert. The trial court then sustained the objection.

Because the trial court sustained the objection, there can be no error as to the admission of evidence calling for Gagner's expertise about factors that might have affected the course of a trajectory. And because Newbern failed to raise a timely objection to Gagner's measurements or use of the ETS, and he has not shown a manifest error affecting a constitutional right, he has waived appellate review of this issue. *Florczak*, 76 Wn. App. at 72 (citing *State v. Lynn*, 67 Wn. App. 339, 342, 835 P.2d 251 (1992)); *State v. Burnley*, 80 Wn. App. 571, 572, 910 P.2d 1294 (1996) ("If a criminal defendant wants to keep certain evidence from the jury, he or she must act before the State offers that evidence."); RAP 2.5(a)(3). Thus, we find no error.

### III. PRIOR INCONSISTENT STATEMENT

Newbern argues that the trial court abused its discretion when it admitted Jones's Madigan and Harborview statements to impeach her trial testimony.

The trial court admitted Jones's earlier descriptions

---

[4]The record contains no trial court ruling on Gagner's status as an expert witness. However, in pretrial colloquy, the State referred twice to its "expert witness"—presumably Gagner. Newbern did not move pretrial regarding Gagner's qualifications or the scientific foundation for his testimony.

of the incident as prior inconsistent statements. In general, a witness's prior statement is admissible for impeachment purposes if it is inconsistent with the witness's trial testimony. *See State v. Lavaris*, 106 Wn.2d 340, 344, 721 P.2d 515 (1986); 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 256, at 306 (3d ed. 1989) (citing *Pilon v. Lindley*, 100 Wash. 340, 170 P. 1022 (1918) and *Sterling v. Radford*, 126 Wash. 372, 218 P. 205 (1923)).

### A. Madigan Statement

Newbern argues that it was error to admit Jones's Madigan statement because Jones testified that she had no memory of making it. But although the justification supporting impeachment may require that the witness remember the prior *event*, it does not require that the witness remember making the prior *statement*. *See State v. Hancock*, 109 Wn.2d 760, 748 P.2d 611 (1988) (In indecent liberties case, defendant's wife claimed no memory of telling detective that she suspected "that something was going on between her husband and B" and was afraid of him. *Hancock* court approved use of prior contradictory statements to impeach.). *See also* TEGLAND, § 256, at 309.

Generally, "if the witness testifies at trial about an *event* but claims to have no knowledge of a material detail, or no recollection of it, most courts permit a prior statement indicating knowledge of the detail to be used for impeachment." TEGLAND, § 256, at 309 (emphasis added).

> If the witness claims a total lack of memory and gives no substantive testimony on the factual issue at hand, a prior statement by the witness is inadmissible regardless of whether the lapse of memory is genuine because, as mentioned at the beginning of this section, there is simply no testimony to impeach.

TEGLAND, § 256, at 310; *see also* 3A JOHN HENRY WIGMORE, EVIDENCE § 1043, at 1059-61 (1970) (The jury is apt to give the former statement "testimonial value," overshadowing "its aspect as a mere contradiction"; but "[a]n absolute rule of

prohibition would do more harm than good, and the trial court should have discretion.").[5]

Here, although Jones testified about the shooting event, she claimed a lack of memory about making a statement while at Madigan Hospital. But her memory about making the prior statement is not at issue; rather, we focus on her trial testimony. TEGLAND § 256, at 310 (citing *Kuhn v. United States*, 24 F.2d 910 (9th Cir.), *rev'd in part and reh'g denied*, 26 F.2d 463, *cert. denied*, 278 U.S. 605 (1928)). This is because the purpose of using prior inconsistent testimony to impeach is to allow an adverse party to show that the witness tells different stories at different times. 1 McCORMICK ON EVIDENCE § 34, at 114 (John William Strong ed., 4th ed. 1992). From this, the jury may disbelieve the witness's trial testimony. TEGLAND, § 255, at 300.

If a witness does not testify at trial about the incident, whether from lack of memory or another reason, there is no testimony to impeach. TEGLAND, § 256, at 310. *See Kuhn*, 24 F.2d at 913 (improper to impeach witness who fails to give testimony). But conversely, even if a witness cannot remember making a prior inconsistent statement, if the witness testifies at trial to an inconsistent story, the need for the jury to know that this witness may be unreliable remains compelling. *See generally Hancock*, 109 Wn.2d at 765. Here, Jones testified to an inconsistent story when she

---

[5]Some other jurisdictions also allow the use of a prior inconsistent statement after a witness claims a lack of memory. Thus, the Oklahoma court affirmed the admission of an inconsistent statement by a witness who testified at trial that she could not remember anything. *Douglas v. State*, 1997 Okla. Crim. 79, 951 P.2d 651, 676 (1997), *cert. denied, Douglas v. Oklahoma*, 525 U.S. 884, 119 S. Ct. 195, 142 L. Ed. 2d 159 (1998). The Tennessee court affirmed the admission of a prior inconsistent statement to impeach a witness who neither admitted or denied making a contradictory statement but merely testified that he did not remember making the statement. *Dailey v. Batemen*, 937 S.W.2d 927, 930 (Tenn. Ct. App. 1996). The Mississippi court approved of the use of a prior inconsistent statement to prevent the witness who claimed a failing memory "from seeking refuge in a lack of recollection." *Bush v. State*, 667 So. 2d 26, 28 (Miss. 1996). And other courts have held that impeachment by prior inconsistent statement is proper if the trial court determines that the witness is feigning lack of memory. *United States v. Rogers*, 549 F.2d 490, 496, 40 A.L.R. FED. 605 (8th Cir. 1976); *State v. King*, 180 Ariz. 268, 883 P.2d 1024, 1031 (1994); *State v. Lenarchick*, 74 Wis. 2d 425, 247 N.W.2d 80, 87 (1976); *People v. Green*, 3 Cal. 3d 981, 479 P.2d 998, 1002 (1971).

said the shooting had occurred by accident. Thus, the trial court did not err in allowing the State to use Jones's Madigan statement to impeach her trial testimony.

## B. Harborview Statement

Newbern claims that the trial court erred when it admitted Jones's Harborview interview because many of the statements she made at the hospital were consistent with her trial testimony and she admitted at trial that others were untrue.

▉ To be admissible for impeachment purposes, a witness's in-court testimony need not directly contradict the witness's prior statement. TEGLAND § 256, at 307. We determine inconsistency using the following test:

> [I]nconsistency is to be determined, not by individual words or phrases alone, but the *whole impression or effect* of what has been said or done. On a comparison of the two utterances, are they in effect inconsistent? Do the two expressions appear to have been produced by inconsistent beliefs?

*Sterling*, 126 Wash. at 375 (quoting 2 WIGMORE ON EVIDENCE, § 1040, at 1208); *State v. Dickenson*, 48 Wn. App. 457, 466-67, 740 P.2d 312 (1987); TEGLAND § 256, at 307. The federal courts apply a similar standard:

> To be received as a prior inconsistent statement, the contradiction need not be in plain terms. It is enough if the 'proferred testimony, taken as a whole, either by what it says or by what it omits to say' affords some indication that the fact was different from the testimony of the witness whom it sought to contradict.

*United States v. Gravely*, 840 F.2d 1156, 1163 (4th Cir. 1988) (quoting *United States v. Barrett*, 539 F.2d 244, 254 (1st Cir. 1976)); *see also ·United States v. McCrady*, 774 F.2d 868, 873 (8th Cir. 1985); *United States v. Dennis*, 625 F.2d 782, 795 (8th Cir. 1980); *United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977).

The emphasis in this liberal approach is on aiding the

finder of fact in evaluating the credibility of the witness's testimony. McCormick on Evidence § 34, at 116. Courts and commentators have both acknowledged that the jury is better able to determine the value and weight to give a witness's trial testimony if it knows that the witness expressed contrary views while the event was still fresh in the witness's memory and before the passage of time created opportunities for outside influence to distort the statement. McCormick on Evidence § 34, at 116; *Judson v. Fielding*, 227 A.D. 430, 433, 237 N.Y.S. 348, 352 (1929) (quoted in McCormick on Evidence § 34, at 116 n.21).

Here, Jones testified at trial that the shooting was accidental; the "whole impression or effect" of the details she described at trial supported this allegation. *See Dickenson*, 48 Wn. App. at 467. But this testimony was directly contrary to the critical portions of the statements that she made to Bomkamp three months earlier, shortly after the shooting. *See Dickenson*, 48 Wn. App. at 467. These contradictions included statements about Newbern's anger with her, his yelling at her to get off the phone, and his pointing the gun directly at her while she stood outside the front door before the shooting. These inconsistencies are important, not because one version of the events is more believable than the other, but because they raise serious questions about Jones's credibility and perceptions. *See Dickenson*, 48 Wn. App. at 468. Consequently, the trial court did not abuse its discretion when it admitted Jones's prior statements for impeachment purposes.

██ Newbern further contends that the trial court erred by not giving the jury a limiting instruction, stating that it was to consider the tape for impeachment purposes only. Although Newbern would have been entitled to such an instruction had he requested it, ER 105,[6] he failed to do so at trial. A party's failure to request a limiting instruction

---

[6]ER 105 states: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

constitutes a waiver of that party's right to such an instruction and fails to preserve the claimed error for appeal. *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 255, 744 P.2d 605 (1987); *Sturgeon v. Celotex*, 52 Wn. App. 609, 624, 762 P.2d 1156 (1988).[7] Thus, Newbern waived his right to complain about this omission on appeal. *Sturgeon*, 52 Wn. App. at 624.

## IV. APPEARANCE OF FAIRNESS DOCTRINE

Newbern contends that the trial judge showed bias toward him, thereby violating the appearance of fairness doctrine. He claims this violation mandated the granting of his motion for a mistrial. We disagree.

 The grant of a mistrial is appropriate only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will receive a fair trial. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). We review this issue using an abuse of discretion standard. *Lewis*, 130 Wn.2d at 707.

 A purpose of the appearance of fairness doctrine is to prevent a person who is potentially interested or biased from participating in the decision-making process. *City of Hoquiam v. Public Employment Relations Comm'n*, 97 Wn.2d 481, 488, 646 P.2d 129 (1982). To obtain application of the doctrine, the challenging party must show evidence of the decision-maker's actual or potential bias. *State v. Post*, 118 Wn.2d 596, 619 n.8, 826 P.2d 172, 837 P.2d 599 (1992); *State v. Carter*, 77 Wn. App. 8, 12, 888 P.2d 1230 (1995).

The judge in *Carter* had commented on the defendant's guilt in connection with the defendant's *Alford* plea and subsequent sentencing. *Carter*, 77 Wn. App. at 11; *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). But because the judge's comments did not evi-

---

[7]Further, "[a]bsent a request for a limiting instruction, evidence which is admitted as relevant for one purpose is deemed relevant for others." *Lockwood*, 109 Wn.2d at 255.

dence "actual or potential bias" as required by *Post,* the comments did not disqualify the judge from presiding over the defendant's trial following vacation of the *Alford* plea. *Carter,* 77 Wn. App. at 12.

Here, although the trial judge expressed displeasure at the delay, he did not blame either party and his remarks had no bearing on the merits of either side's theories. Further, when Newbern renewed his motion for a mistrial stating that he felt animosity from the jurors, he "couldn't pinpoint anything specific."

In addition, the trial court, at Newbern's request, issued a curative instruction reminding the jury that any delays should not be part of its deliberative process and that the trial court's comments were not directed to any party. We presume that the jury followed the trial court's curative instruction. *State v. Johnson,* 124 Wn.2d 57, 77, 873 P.2d 514 (1994); *State v. Hanna,* 123 Wn.2d 704, 711, 871 P.2d 135 (1994). Thus, given the absence of evidence of prejudice or bias and the presence of the trial court's curative instruction, we conclude that the trial court did not abuse its discretion by denying Newbern's motion for a mistrial.

## V. CUMULATIVE ERROR

Newbern, citing *State v. Lampshire,* 74 Wn.2d 888, 447 P.2d 727 (1968), claims that the cumulative effect of the trial court's errors denied him a fair trial. *State v. Johnson,* 90 Wn. App. 54, 950 P.2d 981 (1998). The cumulative error doctrine mandates reversal when the cumulative effect of nonreversible errors materially affects the outcome of trial. *Johnson,* 90 Wn. App. at 74 (citing *State v. Russell,* 125 Wn.2d 24, 93, 882 P.2d 747 (1994)). Finding no error, we find the doctrine is not applicable here. *See In re Personal Restraint of Lord,* 123 Wn.2d 296, 332, 868 P.2d 835 (1994).

We affirm.

BRIDGEWATER, C.J., concurs.

MORGAN, J. (concurring) — I concur in the result reached by the majority. I write separately to make three points:

1. The conversations related in the third, fourth, fifth and sixth paragraphs of the majority opinion were not admissible to prove the facts asserted therein. ER 801(c). Accordingly, those conversations are not the facts of the case, and the majority should not be reciting them as such. The majority seems to be doing exactly what we instruct juries they cannot do—using, as proof of the facts of the case, out-of-court statements admitted solely to impeach a witness' credibility.

2. The conversations related in the majority opinion were admissible—though only to impeach—after Jones testified from the witness stand that Newbern had shot her by accident. *State v. Hancock*, 109 Wn.2d 760, 748 P.2d 611 (1988); *State v. Lavaris*, 106 Wn.2d 340, 721 P.2d 515 (1986).

3. We are not asked to evaluate whether the evidence admitted to prove its truth, as opposed to evidence admitted only to impeach, is sufficient to support the verdict and judgment.

Review denied at 138 Wn.2d 1018 (1999).