# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 71523-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| GYORGY ZATLOKA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 20, 2015 |
| | ) | |

LAU, J. — A trial court has no obligation to provide a limiting instruction to the jury that is not requested by counsel. And in this case, trial counsel's decision not to request a jury instruction was a reasonable strategic choice in order to avoid emphasizing unfavorable testimony. Accordingly, we affirm Gyorgy Zatloka's second degree assault conviction.

## FACTS

On July 5, 2013, Klara Zatloka was home alone in Kirkland. Her husband, Gyorgy Zatloka, had left a week earlier for a hang gliding trip in Lake Chelan. On that

day, Klara went to a doctor and learned that a bone in her hand was fractured.[1] Klara told the doctor she injured herself by grabbing onto a chair to prevent herself from falling. However, after she returned home and talked to her son on the telephone, Klara called the police to report that she had been assaulted.

The next day, on July 6, a police officer went to Klara's house in response to her call, interviewed her, and took a statement. Klara then went to her son's house, where she stayed for three weeks. On July 8, Klara saw an orthopedic surgeon and told the surgeon that the fracture occurred when her husband grabbed her during a fight. When Gyorgy returned from his trip around this time, police officers arrested him. The State charged Gyorgy with assault in the second degree—domestic violence, alleging that on June 26, 2013, Gyorgy assaulted and recklessly inflicted substantial bodily harm upon Klara. In a later amended information, the State added an allegation that the offense was a part of an ongoing pattern of psychological, physical, or sexual abuse manifested by multiple incidents over a prolonged period.

At the December 2013 trial, the testimony established that Klara and Gyorgy met in Hungary and were married for almost 40 years.[2] Thirty years ago, they emigrated from Hungary with their two young children and eventually settled in the Seattle area. Gyorgy was initially employed as an engineer for a brief period, but for the most part, Klara financially supported the family by working as a tailor.

---

[1] Because Klara and Gyorgy Zatloka share the same last name, we use their first names for clarity.

[2] Klara filed for dissolution shortly after she reported the June 2013 assault. By the time of trial, the dissolution was final.

In her testimony at trial, Klara described coming home from work on June 26, 2013, to find Gyorgy packing for a nine-day hang gliding trip. Feeling resentful, Klara asked Gyorgy "again and again" how he had "earned" a vacation when she was the one who was working. Gyorgy ignored her at first but then he grabbed Klara, she fell to her knees, and he dragged her by the hand to the kitchen while calling her a "stupid bitch" who "screw[ed] up everything." IV Report of Proceedings (Dec. 12, 2013) (RP) at 338–39. Once in the kitchen, Gyorgy sprayed Klara with a hose from the kitchen faucet until she was soaked to her underwear.

The next day, Klara could not use her hand or go to work. Klara showed Gyorgy her bruised and swollen hand and told him that if someone asked what happened, she would tell the truth and would not protect him any longer. The following day, Gyorgy left for his Lake Chelan trip.

Pursuant to the trial court's ruling allowing the State to present evidence of abuse that occurred within the most recent 10 years of marriage to address the issue of delayed reporting, Klara testified to two specific prior incidents. Klara testified that in 2002, when she and Gyorgy were arguing while returning from a kayaking trip, they stopped driving and Gyorgy beat her in their van. Klara had visible bruising all over her body. When they met up a short time later with hang gliding friends, Klara explained that she was bruised from kayaking. Klara said she did not tell the truth because she was afraid of what Gyorgy would do and because she was ashamed.

Klara described another time, around 2005, when she and Gyorgy argued while she was cooking food to take to her son for Christmas dinner. Gyorgy first threw a pot of food at her and then a large flashlight. The flashlight battery dislodged and struck

Klara on the forehead, resulting in a large cut that required several stitches. Klara told medical personnel that she injured herself playing with her dog. She explained that, again, she did not tell the truth at the time because she was afraid and ashamed and because Gyorgy was with her at the hospital. Klara said Gyorgy promised at that time that he would never hurt her again.

Klara also described Gyorgy's controlling behavior during the marriage. She said Gyorgy rarely allowed her to speak for herself, made fun of her Hungarian accent, became enraged if she said the wrong thing, and convinced her she was stupid and could "do nothing without him." RP at 333–34. Klara said that in addition to the incidents in the past 10 years when Gyorgy's physical assaults caused visible injuries, Gyorgy frequently pushed or head butted her during arguments.

During the first 15 years the family lived in the United States, Klara was isolated and without friends. However, she eventually became close friends with a few of the women who were a part of the group of hang gliders with whom she and Gyorgy frequently spent the weekends. Klara testified that at some point, she admitted to these friends that her prior injuries were caused by abuse.

Two of Klara's friends testified and corroborated her testimony about visible injuries in 2002 and 2005. The friends also testified that in conjunction with observing injuries, they also could tell from Klara's demeanor that something was wrong because she was evasive, withdrawn, and nervous. They said that when Klara eventually told them the truth about the injuries, she was tearful and afraid. One friend asked Gyorgy directly how Klara hurt her head, and he said she hit her head on a cupboard. Friends also described Gyorgy's domineering and physically intimidating behavior.

-4-

Larry Jorgensen, the husband of one of Klara's close friends and one of the hang gliders, testified about a specific conversation with Gyorgy during a hang gliding trip. Jorgenson testified that he took Gyorgy aside one day after he "talked to" Klara and "found out" that Gyorgy was hitting her. RP at 416. Jorgensen said that Gyorgy "admitted" that he had hit Klara. But Gyorgy said that in Hungary, it is "acceptable or more acceptable to do that." RP at 417. Jorgensen also said that during this discussion, Gyorgy "agreed not to ever do it again." RP at 417. On cross-examination, Jorgensen admitted that he never witnessed any physical abuse and never talked directly to Klara about the abuse but only learned of it from a third party.

Gyorgy testified that following Klara's breast cancer diagnosis and surgery in 2012, her attitude "just deteriorated." V RP (Dec. 16, 2013) at 537. Gyorgy said Klara became angry and depressed and began to smoke and drink alcohol excessively. Gyorgy said Klara believed the cancer operation she underwent was unnecessary and blamed him for bringing her to the United States.

According to Gyorgy, on the night of June 26, Klara came home from work and proceeded to drink heavily. Gyorgy testified that he and Klara argued about reconstructive breast surgery and eventually had a physical struggle over bottles of beer that he was taking from her and pouring out. Gyorgy said Klara lost her footing while trying to hit him and she fell. Gyorgy said he sprayed Klara with water from the kitchen faucet hose for one or two seconds to calm her down. Gyorgy said Klara left the house after the fight and slept on a park bench awhile, went to a gas station and bought cigarettes, and finally, returned home to sleep.

Gyorgy denied having a conversation with Jorgensen about hitting or abusing Klara in any way. He remembered other conversations about cultural differences, specifically regarding children and corporal punishment.

About the injuries following the 2002 kayaking trip, Gyorgy said he and Klara were both "bruised up" from windsurfing. As for Klara's 2005 head injury, Gyorgy said he threw the flashlight at the floor, not at Klara, and the injury was entirely accidental. Gyorgy denied silencing Klara in public but said he merely translated for her to help and because she wanted him to do so.

The jury found Gyorgy guilty as charged of assault in the second degree. Gyorgy then waived his right to a jury trial for the aggravating factor. The State presented additional evidence on the aggravating factor, and the court found that the offense was a part of an ongoing pattern of abuse and imposed an exceptional sentence. Gyorgy appeals.

<u>Limiting Instruction</u>

Gyorgy contends the trial court erred by admitting Jorgensen's hearsay testimony that he talked to Klara and found out that Gyorgy was hitting her without also providing a limiting instruction to inform the jury that it could not consider this testimony as evidence of past abuse or as evidence that he was guilty of the charged crime. The court overruled Gyorgy's objection and then denied his motion to strike.

Gyorgy belatedly raised a hearsay objection only after the prosecutor interrupted Jorgensen and elicited further testimony about Klara's nickname. Although Gyorgy assigns error to the trial court's decision overruling his objection, he makes no argument to support the assignment or error, nor does he claim that his objection was timely. <u>See</u>

RAP 10.3(a)(6) (appellate brief should contain argument in support of the issues presented for review). And significantly, Gyorgy acknowledges that there was a valid basis to overrule the objection "on the grounds that the information was context for Zatloka's own purported statement" admitting to abuse. Br. of Appellant at 9. Nevertheless, Gyorgy contends that his conviction must be reversed because the court admitted hearsay testimony without limiting the jury's consideration of it.

Specifically, Gyorgy argues that the trial court had a duty to ensure that the jury knew that only his admissions could be used as substantive evidence against him. We disagree. Gyorgy did not request a limiting instruction with respect to this evidence.[3] The failure to do so constitutes a waiver of any error.

We review alleged errors of law in jury instructions de novo. State v. Willis, 153 Wn.2d 366, 370, 103 P.3d 1213 (2005). ER 105 states, "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis added.) "A party's failure to request a limiting instruction constitutes a waiver of that party's right to such an instruction and fails to preserve the claimed error for appeal." State v. Newbern, 95 Wn. App. 277, 295–96, 975 P.2d 1041 (1999).

A court is under no duty to give a limiting instruction sua sponte. State v. Noyes, 69 Wn.2d 441, 446–47, 418 P.2d 471 (1966); accord, State v. Russell, 171 Wn.2d 118,

---

[3] Defense counsel proposed and the trial court provided a limiting instruction that pertained to the ER 404(b) evidence introduced by the State. This instruction informed the jury that the evidence of prior assaults could be considered only for assessing Klara's credibility and her delay in reporting and not for propensity.

123, 249 P.3d 604 (2011) ("Since Noyes, this court has continued to hold that absent a request for a limiting instruction, the trial court is not required to give one sua sponte."); State v. Athan, 160 Wn.2d 354, 383, 158 P.3d 27 (2007) (although a limiting instruction on the use of admitted hearsay evidence "is generally required, the failure of a court to give a limiting instruction is not error when no instruction was requested"). No authority cited by Gyorgy suggests otherwise.

Because Gyorgy did not request a limiting instruction, he has not preserved the issue for our review. The trial court had no affirmative duty to provide a limiting instruction in the absence of a request to do so.

### Ineffective Assistance of Counsel

Alternatively, Gyorgy contends that he was deprived of the effective assistance of counsel because his attorney failed to propose an appropriate limiting instruction.

To establish ineffective assistance of counsel, Gyorgy must show that (1) his counsel's performance was deficient and (2) the deficient performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334–35, 899 P.2d 1251 (1995). To prevail on a claim of ineffective assistance of counsel, Gyorgy must overcome a strong presumption that defense counsel was effective. Strickland, 466 U.S. at 689; McFarland, 127 Wn.2d at 335. "If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel." State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Prejudice occurs if, but for the deficient performance, there is

a reasonable probability that the outcome of the proceedings would have been different. McFarland, 127 Wn.2d at 334–5.

Gyorgy fails to establish deficient performance or prejudice. In the case of damaging testimony, we presume that counsel made a reasonable strategic decision not to request a limiting instruction in order to avoid bringing further attention to the evidence. State v. Yarbrough, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009); State v. Price, 126 Wn. App. 617, 649, 109 P.3d 27 (2005); State v. Barragan, 102 Wn. App. 754, 762, 9 P.3d 942 (2000). Moreover, although Jorgensen initially said he "found out" about the abuse by talking to Klara, he later clarified that he never spoke directly with Klara about the matter. The logical inference from Jorgensen's testimony was that he heard about the hitting from his wife. Jorgensen's wife also testified that Klara eventually confided in her about the cause of her injuries and that Jorgensen may have overheard some of her discussion with Klara. In light of all the testimony, it does not appear that Jorgensen's brief remark that he learned about some abuse was especially prejudicial. Nor is there any reasonable probability that, but for counsel's decision to not request a limiting instruction as to this evidence, the outcome of the trial would have been different.

In sum, defense counsel's failure to request an instruction on the jury's use of Jorgensen's testimony was a legitimate tactical decision. Gyorgy fails to establish any resulting prejudice. His ineffective assistance of counsel claim fails.

Finally, Gyorgy raises several claims of error in a statement of additional grounds for review. However, all of his arguments rely on facts outside the record before us on direct review. When a defendant raises issues that require evidence or facts not in the

existing record, the appropriate means of doing so is through a personal restraint petition. McFarland, 127 Wn.2d at 335.

We affirm the conviction.

WE CONCUR: