# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 53722-2-II |
| CARLOS PEREZ CALDERON, | |
| Petitioner, | UNPUBLISHED OPINION |

CRUSER, J. — In this personal restraint petition (PRP), Carlos E. Perez Calderon challenges his conviction for second degree murder. He argues that he received ineffective assistance of counsel on appeal and at trial.

Calderon's ineffective assistance of appellate counsel claim is based on appellate counsel's failure to argue that (1) the trial court abused its discretion when it ruled that testimony from a detective about a witness's omission of certain facts in an interview was not admissible as a prior inconsistent statement, and (2) the exclusion of this evidence deprived him of his constitutional right to present a defense. The first argument fails because the trial court properly refused to admit the evidence as a prior inconsistent statement since Calderon failed to lay the necessary foundation for admission as a prior inconsistent statement under ER 613. The second argument fails because the trial court's refusal to admit the prior inconsistent statement did not preclude Calderon from impeaching the witness and the evidence of guilt was overwhelming.

Calderon's ineffective assistance of trial counsel claim is based on trial counsel's failure to argue in closing argument that the State's failure to conduct "gunpowder" residue testing of his hands established a reasonable doubt that he shot the victim. But trial counsel's failure to make this argument was not prejudicial in light of the other uncontested evidence that established that such testing was highly unreliable.

Accordingly we deny Calderon's PRP.

FACTS[1]

I. THE SHOOTING

On June 6, 2015, Amanda "Mindy" Hughes, who had been Calderon's girlfriend, and her daughters, eight-year-old MC and four-year-old GH, were staying in Calderon's home. While the children were in the home, Calderon and Hughes got into an argument and Hughes was shot in the chest.

Calderon called 911 and attempted to provide aid to Hughes. Calderon's friend Ivan Montes arrived at the house shortly after the shooting and saw Calderon on the floor next to Hughes. Calderon had one hand over the gunshot wound and was trying to administer CPR with his other hand. According to Montes, the "younger child" was standing near her mother. 3 Report of Proceedings (RP) at 239. Montes took GH to a bedroom and told her to stay there with MC, who was already in the room. Montes returned to the living room to try to help Hughes.

Calderon told Montes that his gun had been on the table and "went off" when Hughes "flipped the table." *Id.* at 241. Montes asked Calderon where the gun was, but Calderon said he

---

[1] The record from the direct appeal, *State v. Calderon*, No. 49343-8-II (Wash. Ct. App. Apr. 10, 2018) (unpublished), http://www.courts.wa.gov/opinions/, was considered as part of this petition.

could not find the gun and did not know where it was. Montes found the gun and put it in the kitchen.[2] Montes then administered CPR to Hughes while Calderon put pressure on the gunshot wound with his hands.

When the officers arrived, they found Montes and Calderon in the living room trying to help Hughes. The officers observed that Calderon was putting pressure on Hughes's gunshot wound with his hands and that he had blood on him. One of the officers observed that "the table [was] flipped on the floor." 2 RP at 196.

The officers found the two children in a bedroom. Chaplains Larry and Diane Huffman were called in to tell the children that their mother had died and to transport them to the police station.

Calderon spoke to and was interviewed by several officers and consistently denied shooting Hughes. Although he could not explain how the gun had fired, Calderon told the officers that the gun fired when Hughes flipped over the coffee table the gun had been on.

II. INTERVIEWS WITH MC

A. JUNE 19, 2015 INTERVIEW

On June 19, 13 days after the shooting, MC was interviewed at the Child Advocacy Center. Detective Reynaldo Punzalan observed the interview and described the interview in a supplemental police report.

Punzalan's supplemental report described what MC said during this interview, but it did not mention MC saying anything about hearing Calderon tell her mother to bend down while they

---

[2] It is not clear from the record where Montes found the gun.

were arguing. There was nothing in the supplemental report establishing that MC's June 2015 statements were made under oath.

B. APRIL 2016 INTERVIEW

Ten months later, in April 2016, defense counsel interviewed MC. During this interview, MC told defense counsel that she saw Calderon with the gun and that she had seen him shoot her mother, facts she had not previously disclosed. She later asserted, however, that although she had seen Calderon with the gun and had heard the shooting, she had not seen the shooting.

MC also stated, for the first time, that she heard Calderon tell her mother to "bend down" before he shot her. PRP Decl. of Wayne Fricke, App. B at 27-28. After defense counsel asked her if she was sure she heard this statement and her grandmother reminded her that she had to tell the truth, MC reiterated that she had heard Calderon tell her mother to "bend down." *Id.* at 28.

### III. TRIAL

The State charged Calderon with second degree murder and, in the alternative, second degree felony murder with the predicate offense of second degree assault. The case proceeded to a jury trial.

At trial, the State presented testimony from Montes, the officers who responded to the incident, MC, the chaplains who transported the children, the medical examiner, Detective Christopher Bowl, and a forensic scientist. We describe the testimony from Montes, the responding officers, and Punzalan in the facts above. We describe the testimony of the remaining witnesses below. Calderon did not present any evidence.

A. TESTIMONY

1. MC

MC was nine years old at the time of the trial. She testified that before the shooting, she saw her mother and Calderon arguing and saw her mother throw something at Calderon, but her mother then sent her (MC) to her room. While in her room, MC "heard something like go, boom, kind of." 3 RP at 290. MC testified that at one point she came out of the room and "sneaked and looked and . . . saw her [mother] lying down on the [floor]." *Id.*

The State questioned MC about the April 2016 interview and asked her if she recalled telling defense counsel that she saw Calderon holding the gun. MC initially responded that she "thought he was," but she later clarified that she did not know if she actually saw him holding the gun. *Id.* at 297.

The State then asked MC if she heard Calderon tell her mother to do anything, and she responded that she heard him tell her to "bend down . . .[a] few times." *Id.* She estimated that she heard the gun go off 10 or 15 minutes after Calderon told her mother to bend down.

On cross-examination, defense counsel asked MC if she remember telling him during the April 2016 interview that Calderon had told her mother "to get down, or bend over," and MC responded that she did. *Id.* at 300. Although defense counsel questioned MC about whether she said anything during the June 2015 interview about seeing Calderon shoot her mother or seeing Calderon with the gun, defense counsel did not ask MC if she had mentioned the "bend over" statement before April 2016.

2. THE CHAPLAINS

Larry Huffman, one of the chaplains who took the girls to the police station, testified that while he and his wife were with MC and GH, MC told them that she had heard her mother and Calderon arguing in the living room and that her mother had asked her to go out on the back porch with her sister. MC stated that she was on the porch praying for her mother when she heard "a loud bang." *Id.* at 320.

Diane Huffman, the other chaplain, testified that she talked with MC after they arrived at the police station. *Id.* at 327. MC told Diane Huffman that Hughes and Calderon were fighting and getting loud and that she (MC) took her sister out on the back porch when the girls were asked to leave the room. MC said that the screaming got louder and she (MC) started to pray. MC said that "shortly after she stopped her prayer she heard a gunshot." *Id.*

On cross-examination, defense counsel asked Diane Huffman if MC had mentioned a nutcracker. Diane responded, "[MC] told me that her grandma had sent the girls a nutcracker for Christmas. It was sitting on the dresser in her bedroom, and that there were times at night when the nutcracker would talk to her." *Id.* at 332. MC also told Diane Huffman that "the nutcracker told her [(MC)] it hated her and that she was going to die." *Id.* at 333.

Neither Larry nor Diane Huffman testified that MC mentioned hearing Calderon tell Hughes to bend down.

3. MEDICAL EXAMINER

Pierce County Medical Examiner Dr. Thomas Clark testified that the bullet that killed Hughes entered her right upper chest and then "passed backward, down [towards her feet] and slightly to the left." 4 RP at 473-74. The bullet passed through Hughes's first rib on the right side,

lacerated her aorta, pierced the lower lobe of her right lung, and continued through her until it lodged in her spine.

Dr. Clark testified that the "wound tract" was "consistent with the shooter standing facing Ms. Hughes and she was bent over toward him." *Id.* at 489. But on cross-examination, Dr. Clark agreed that the wound track could also be consistent with someone stumbling, "depend[ing] on which way the person was stumbling." *Id.* He further testified that he had no way of knowing whether Hughes had been standing or seated when she was shot. Dr. Clark also testified that because there was no stippling on Hughes, there was no indication that the gun was fired less than two feet away from Hughes.

4. DETECTIVE CHRISTOPHER BOWL

Detective Christopher Bowl testified that the police swabbed Calderon for biological evidence but not for "gunshot residue." *Id.* at 500. Bowl stated that the police did not conduct gunshot residue tests anymore because there were too may false positives from these tests.

5. FORENSIC SCIENTIST

Forensic scientist Johan Schoeman from the Washington State Patrol Crime Laboratory testified about gunshot residue testing and gun testing.

Schoeman described the two types of gunshot residue that are created when a gun fires, primer residue and soot,

> Primer residue are the barium, lead and antimony that you will get on the primer of that cartridge. Every opening that the gun has when you pull the trigger and this whole chain reaction of burning starts taking place, the primer residue will land on your hands, your clothes, or on surfaces around the area where the firearm was discharged. Some of that primer residue from the primer also exits the muzzle of the gun.

The second part will be the soot, particularly burned, and any burned propellant particles or gunpowder leaving the muzzle of the gun and gets deposited on clothing, on a victim's shirt, jacket or jersey or whatever the case may be in the form of a circle. . . . If you are far away, you will have a big pattern. The closer you move towards the muzzle of the gun, the smaller the pattern is going to be.

5 RP at 562.

Schoeman further testified that although the laboratory still tested clothing for soot residue, it had not tested for primer residue since August 1996, because "[s]tudies have found it is not very reliable." *Id.* at 563. Specifically, he testified,

If you and I are in the same room, and I fire a gun and you are close to me, you're going to pick up some of the primer residue. If you test positive for primer residue, does it mean you fired the gun? If you are tested negative for primer residue, does it mean you did not fire the gun? If you fire a gun and you just wipe your hands, you are getting rid of the primer residue because it is so small and so light you can rub it off, and then you will test negative. Primer residue is going to land on surfaces. If you just go with your hand like this over a table or area the gun was discharged, you are going to test positive for primer residue, and I wipe mine off (sic). So *there is no real significance on performing the primer residue examinations.* That is why we haven't done if for the last 30 years, since 1996.

*Id.* (emphasis added).

Additionally, Schoeman testified that the gun had a "drop safety" that prevented the gun from firing unless the gun's trigger was pulled. 4 RP at 533. He also stated that the gun had a trigger guard that would minimize the risk that the trigger would be accidently pulled if the gun were dropped.

Schoeman further testified that he had conducted a series of "drop tests" on the gun to determine if the gun would discharge if it fell, was dropped, or was bumped against something. 5 RP at 558. Schoeman was unable to get the gun to fire if he hit it with a rubber mallet while the gun was cocked or by dropping the gun in various orientations from a distance of about four feet. He testified that he would have been able to determine "[i]f this firearm had a slight possibility of

8

going off" if dropped or struck and that the tests revealed that it would not have fired without the trigger being pulled with about "seven and a quarter pounds" of force.[3] *Id.* at 560-61.

B. MOTION TO ALLOW PUNZALAN TO TESTIFY ABOUT THE JUNE 2015 INTERVIEW

During Punzalan's testimony, defense counsel moved to allow Punzalan to testify that during the June 2015 interview MC did not mention that Calderon told her mother "to bend down." 4 RP at 392, 393. Without specifying any evidence rule, defense counsel asserted that this evidence was admissible as a prior inconsistent statement.

The State responded that MC's failure to say something during the June 2015 interview was an "omission," not an inconsistent statement, so her failure to mention the "bend down" statement during that interview could not be used to impeach MC. *Id.* at 394. The State also argued that because defense counsel had not asked MC while she was testifying about her failure to mention the "bend down" statement during the June 2015 interview and had not provided her with an opportunity to explain or deny any potentially inconsistent statement, the evidence regarding her failure to mention this statement in the June 2015 interview was not admissible as extrinsic evidence of a prior inconsistent statement by a witness under ER 613(b).

Defense counsel responded that he believed he had asked MC if she had told anyone else about the "bend down" statement and had given her the opportunity to explain or deny the omission in the prior statement.[4] After reviewing its notes, the trial court responded that defense counsel had

---

[3] Schoeman testified that picking up a gallon of milk with one finger created a force against the finger of approximately eight pounds.

[4] Calderon now admits that defense counsel was mistaken and that the trial transcript does not show that defense counsel had asked the child about this subject.

questioned MC about her assertion that she had seen Calderon with the gun, not her failure to mention the "bend down" statement during the June 2015 interview.

The trial court ruled that Punzalan could not testify about the June 2015 interview, stating, "I don't think there is anything that is being impeached or being offered to impeach this statement or her testimony through what has been presented to me in this offer of proof. I am not going to allow you to go into this area at this point in time." *Id.* at 396.

## C. CLOSING ARGUMENTS

### 1. STATE'S CLOSING ARGUMENT AND REBUTTAL

In its closing argument and rebuttal, the State argued that Calderon had intentionally shot Hughes or had shot her while intentionally assaulting her. The State repeatedly referred to MC's testimony that she "heard [Calderon] tell her mom to bend down" and argued that this evidence was consistent with the medical examiner's testimony that Hughes was shot from more than two feet away while bending down. 5 RP at 623. The slides the State showed the jury during closing argument also referred to the "bend down" statement.

### 2. DEFENSE CLOSING ARGUMENT

In Calderon's closing argument, defense counsel argued that the shooting was accidental and that Calderon did not shoot Hughes. Defense counsel's argument largely focused on witness credibility.

As to MC's "bend down" statement, defense counsel argued that if Hughes had been bent over when she was shot, she would have fallen face down and that there was no evidence that she fell forward. Defense counsel also suggested that the medical examiner's testimony that the bullet may have deflected a bit when it hit the rib would support this theory.

Defense counsel then discussed MC's testimony and her credibility,

> [MC], now we can all feel for this young lady having to get up here and testify, a nine-year-old girl, eight-year-old girl. It is a horrible thing. I would suggest to you that what she says is inconsistent. Did she pray or not? I don't know. I don't know that it matters. She probably did.
>
> When she told the chaplain she had herself praying going out to the back deck and praying out there. She did acknowledge later on that she never went out to the deck. She went to the room and closed the door.
>
> *Did she say that she heard my client tell Ms. Hughes to bend over? Yeah, she said that. She didn't say when that happened. I am going to suggest to you that that is a creation of her memory that happened in April that didn't exist before*.
>
> Now, this is illustrative Exhibit No. 79. You are also not going to have this one back in the jury with you because it is not admitted as substantive evidence. For purposes of argument -- I don't know if it was shown to you. In April of this year in an interview, [MC] drew this. She draws this. She had this in her mind, my client coming up with a gun in his hand to Ms. Hughes and leaning over her and shooting her.
>
> Now, she acknowledged, well, she was just trying to come up with an explanation as to what happened. I have no doubt that that is true, and that's consistent with what she says. *In the context of coming up with an explanation, she could very easily have said, as part of that, that I heard him say "bend over," even though she never told the chaplains that or anybody else*.
>
> On top of that, the reason we ask these questions, is this nutcracker a big deal? Well, yeah, it is because she has, in the same context of this conversation, this talking nutcracker. Now, it is sad. Maybe it is sweet. I don't know. What it does show in the context of it being able to say that, and being able to have that be a real thing for her, is that she is very imaginative or perhaps suffers from nightmares, I don't know what. She can create things that are impossible to do. She acknowledged she created one scenario again to explain what happened.
>
> When you look at the credibility of the witnesses, including this young lady, these are the things you should look at.
>
> The reason the nutcracker is important for looking at one's credibility is it shows this great imagination she has. I would suggest to you the imagination she has is not credible. She is trying to come up with an explanation as to what happened. That's natural. She wants to explain because she lost her mother. We would . . . all expect her to do that.

11

*Id.* 648-51 (emphasis added).

## IV. VERDICT, APPEAL, AND PERSONAL RESTRAINT PETITION

The jury found Calderon guilty of second degree murder. We affirmed Calderon's conviction in an unpublished decision that mandated on September 11, 2018. *State v. Calderon*, No. 49343-8-II (Wash. Ct. App. Apr. 10, 2018) (unpublished), http://www.courts.wa.gov/opinions/.

On September 3, 2019, Calderon filed this timely PRP. *See* RCW 10.73.090(3)(b).

## ANALYSIS

### I. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Calderon first argues that he received ineffective assistance of counsel on appeal because his appellate counsel did not challenge the trial court's exclusion of Punzalan's testimony about MC's failure to mention the "bend down" statement during the June 2015 interview. Calderon contends that his appellate counsel should have argued that (1) the trial court erred when it concluded that MC's failure to mention hearing the "bend down" statement during the June 2015 interview was not an inconsistent statement and (2) the trial court's exclusion of this evidence deprived him of his due process right to present his defense.

### A. LEGAL PRINCIPLES

To be entitled to relief based on a claim of ineffective assistance of appellate counsel raised in a PRP, Calderon "must show that 'the legal issue that appellate counsel failed to raise had merit'" and that the failure to raise this issue was prejudicial. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 308, 422 P.3d 458 (2018) (quoting *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 777-78, 100 P.3d 279 (2004)). To establish prejudice in this context, Calderon must "'show

a reasonable probability that, but for his counsel's unreasonable failure to [raise this issue], he would have prevailed on his appeal.'" Id. at 308 (quoting *Dalluge*, 152 Wn.2d at 788) (emphasis omitted).

When examining whether the trial court's exclusion of evidence violates the defendant's constitutional right to present a defense, we apply a two part test. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). We first review "the trial court's individual evidentiary rulings for abuse of discretion." *State v. Case*, 13 Wn. App 2d 657, 466 P.3d 799 (2020). Then we consider "de novo the constitutional question of whether those rulings deprived the defendant of their right to present a defense and cross-examine adverse witnesses." *Id.* at 667.

B. EVIDENTIARY RULING

Calderon contends that the trial court erred when it concluded that MC's failure to mention the "bend over" statement in the June 2015 interview was not an inconsistent statement and asserts that there was a reasonable probability that the outcome of the appeal would have been different if appellate counsel had raised this issue.[5] This argument fails.

Calderon argues that the trial court erroneously determined that an omission in a prior statement can never be a prior inconsistent statement. The record does not, however, support this assertion.

When the trial court excluded Punzalan's testimony about the June 2015 interview, the court stated, "I don't think there is anything that is being impeached or being offered to impeach this statement or her testimony through what has been presented to me in this offer of proof. I am

---

[5] The State accepts Calderon's argument that under *State v. Newbern*, 95 Wn. App. 277, 975 P.2d 1041 (1999), an omission can be a prior inconsistent statement.

not going to allow you to go into this area at this point in time." 4 RP at 396. The trial court's

specific reference to the adequacy of the offer of proof belies the conclusion that it relied on the

legal premise that a prior omission can never be a prior inconsistent statement. The trial court

instead ruled that Calderon failed to establish the foundation required to admit the statement as a

prior inconsistent statement, namely that the State afford MC "an opportunity to explain or deny"

the statement, which suggests that the trial court relied on ER 613(b). *Id.* at 395. Thus, Calderon

does not show that the outcome of his appeal would have been different if appellate counsel had

raised this issue in the appeal.[6]

Because Calderon does not establish that the trial court abused its discretion when it

excluded Punzalan's testimony about the omission in MC's June 2015 statement, we hold that

Calderon does not establish ineffective assistance of appellate counsel on this ground.[7]

---

[6] Furthermore, to the extent Calderon may be arguing that Punzalan's testimony about MC's June 2105 statement was admissible as a non-hearsay statement under ER 801(d)(1)(i), Calderon moved to admit this evidence as impeachment evidence, not as substantive evidence, so ER 801(d)(1)(i) does not apply. And even if he had raised an ER 801(d)(1)(i) issue, statements from MC's June 2015 interview were not admissible under this rule because her statement was not made under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, as required under the rule.

[7] Calderon argues in his reply that his trial counsel should have known the law and corrected the State's erroneous assertions that an omission cannot be an inconsistent statement and that appellate counsel's failure to challenge the trial court's ruling "compounded the error." Pet'rs' Reply Br. at 17. But we do not consider this attempt to reframe this issue as an ineffective assistance of trial counsel claim because Calderon raises this issue for the first time in a responsive brief. *State v. Hand*, 199 Wn. App. 887, 899 n.7, 401 P.3d 367 (2017), *aff'd*, 192 Wn.2d 289, 429 P.3d 502 (2018). Furthermore, even if we were to address this argument it would fail because, as discussed above, the trial court's ruling was not based on the alleged error of law.

C. DUE PROCESS

Calderon next argues that appellate counsel provided ineffective assistance of counsel because his "failure to raise the trial [court's] error on direct appeal also allowed a [Sixth and Fourteenth Amendment] due process violation to go unchallenged" and violated Calderon's right to present a defense. PRP at 29. We disagree.

> Because a defendant's constitutional right to present a defense is not absolute, *see, e.g.,* [*State v.*] *Jones*, 168 Wn.2d [713,] 720, 230 P.3d 576 [(2010)], the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted. *Id.* In some instances regarding evidence of high probative value, "it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1 § 22." *State v. Hudlow*, 99 [Wn].2d 1, 16, 659 P.2d 514 (1983).

*Arndt*, 194 Wn.2d at 812.

*Arndt* is instructive here. In *Arndt*, our Supreme Court held that the trial court's evidentiary rulings did not violate the appellant's right to present a defense because the rulings did not eliminate the defendant's entire defense, and she was still able to advance the defense theory of the case. *Id.* at 814. The court distinguished Arndt's case from *Jones*, where "the trial court interpreted a rape shield law to preclude the defendant from presenting *any* evidence that the victim had voluntarily engaged in an 'all-night, drug-induced sex party.'" *Id.* at 812-13 (quoting *Jones*, 168 Wn.2d at 721) (emphasis added). Unlike in *Jones*, Arndt was still permitted to present evidence that pointed to an alternative cause for the fire that she was accused of starting and rebutted some of the State's evidence. *Id.* at 813-14.

As in *Arndt*, MC's failure to present evidence that MC did not disclose the "bend down" statement during the June 2015 interview did not prevent Calderon from presenting his defense. The trial court's ruling in no way prevented Calderon from cross-examining MC about whether

she had mentioned the "bend down" statement during her June 2015 interview. And similar evidence was presented at trial based on MC's statements to the chaplains, and defense counsel was able to argue that MC failed to disclose the "bend down" statement until April 2016 by pointing out that omission. Ultimately, Calderon was able to, and in fact did, argue that the "bend down" statement was a new disclosure in April 2016, and that MC fabricated this statement, as well as other facts, in an attempt to make sense of what had happened to her mother.[8] Furthermore, the evidence that the shooting was not accidental was overwhelming in light of Schoeman's testimony that the gun would not fire without significant force being applied to the gun's trigger, which was protected by a trigger guard.

We hold that because Calderon was able to argue his defense theory to the jury and the additional evidence would have had little impact because of the overwhelming evidence that the only way the gun fired was if the trigger was pulled, his "right to present a defense" was not violated, and Calderon does not show that the outcome of the appeal would have been different if appellate counsel had raised this issue. *See id.* Accordingly, this ineffective assistance of appellate counsel claim also fails.

## II. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIM

Calderon next argues that he received ineffective assistance of trial counsel because his trial counsel failed to argue in closing argument that the lack of "gunpowder" residue testing of his hands created a reasonable doubt that he committed the offense since such testing could have

---

[8] Furthermore, the trial court's ruling did not entirely prevent Calderon from presenting this evidence to the jury because the ruling did not preclude Calderon from calling MC as a witness and asking her directly about what she disclosed during the June 2015 interview and then impeaching her if necessary.

corroborated his claim "that he never touched the gun." PRP at 36. Given the unrefuted evidence from the State's witnesses regarding the reasons gunshot residue tests are not routinely conducted, we hold that this argument fails.

To establish ineffective assistance of trial counsel, Calderon must show that (1) trial "counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances," and (2) this deficient representation was prejudicial, "i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice" for PRP purposes. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Calderon contends that his trial counsel should have argued that the failure to test his hands for "gunpowder" residue created a reasonable doubt because negative results would have corroborated his assertion that he had not handled or fired the gun. But given the facts in this case and testimony about why gunshot residue, specifically primer residue, testing is rarely done, there is no reasonable probability that this argument would have swayed the jury.

Bowl testified that gunshot residue tests were no longer used because they were unreliable. And Schoeman testified that the primer residue tests had "no real significance," because it was easy to wipe away the residue, to have the residue land on you if you were in the room when the gun was fired, or to pick up residue from surfaces where it had landed. 5 RP at 563. The jury also heard that Calderon was in the room when the gun fired; that Calderon had close physical contact

with Hughes after she was shot, including direct contact with the gunshot wound; and that Calderon's hands were covered in blood by the time the officers arrived. Considering the uncontradicted testimony about how easily gunshot residue can be transferred or wiped away, there is no reasonable probability that the jury would have given any weight to the presence or absence of gunshot residue on Calderon's hands under these circumstances.

Calderon cites to *Ard v. Catoe*, 372 S.C. 318, 642 S.E.2d 590 (2007), as an example of "the critical importance of investigating the presence or absence of gunshot residue, and the resulting prejudice that a defendant may suffer when his trial counsel fails to do such an investigation." PRP at 34. But *Ard* addressed an ineffective assistance of counsel claim based on defense counsel's failure to investigate, failure to retain an independent expert to evaluate the gunshot reside evidence, and failure to adequately cross examine witnesses who testified about the gunshot residue evidence. Here, Calderon is not arguing that his trial counsel was ineffective for failing to investigate, failing to retain an expert witness, or failing to cross examine witnesses—he is arguing that counsel was ineffective for failing to argue that the lack of testing established a reasonable doubt, so *Ard* is not helpful.

And although *Ard* discusses the importance of the lack of gunshot residue in that case, we must examine the implication of failure to test for gunshot residue on Calderon's hands in the context of the evidence. As discussed above, the jury heard unrefuted testimony that gunshot residue tests were not reliable and testimony about facts that would bring the reliability of any gunshot residue testing into question.

Because there is no reasonable probability that the jury would have placed any weight on the presence or absence of any gunshot residue on Calderon's hands, we hold that there was no

reasonable probability that the verdict would have been different had trial counsel argued that the lack of gunshot residue testing created a reasonable doubt. Accordingly, this ineffective assistance of trial counsel argument fails.

Because Calderon fails to establish ineffective assistance of appellate or trial counsel, we deny this petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, P.J.

MELNICK, J.